THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARRON K. GREEN *et al*.,

    *Plaintiffs*,

    v.

MULETA T. OBSU, M.D., *et al.*,

    *Defendants*.

Civil Action No. ELH-19-2068

**MEMORANDUM OPINION**

This Memorandum Opinion addresses the "Motion to Dismiss Count VI of the Second Amended Complaint," filed by defendant Wexford Health Sources, Inc. ("Wexford"). ECF 29. The case arises from alleged inadequate medical treatment provided to plaintiff Darron K. Green in 2015, while he was a prisoner in the Central Maryland Correctional Facility ("CMCF"). ECF 17 ("Amended Complaint"); ECF 28 ("Second Amended Complaint" or "SAC").[1]

In an Amended Complaint, filed by counsel on behalf of Mr. Green and his wife, Lolita Munir, plaintiffs sued Wexford and three physicians employed by Wexford: Muleta T. Obsu, M.D.; Bolaji Onabajo, M.D.; and Syed Rizvi, M.D. *Id*. ¶¶ 2-6.[2] The Amended Complaint contained seven counts. Counts I, II, and III asserted negligence claims against Dr. Obsu, Dr. Onabajo, and Dr. Rizvi,

---

[1] Suit was filed by Darron Green and his wife, Lolita Munir, in the Circuit Court for Baltimore City on August 17, 2018. ECF 1 ("Notice of Removal"); ECF 3 ("Complaint"). The case was then transferred to the Circuit Court for Howard County. ECF 1-13. Plaintiffs amended their Complaint on June 27, 2019, adding a count under 42 U.S.C. § 1983. *See* ECF 17. Thereafter, Wexford removed the case to this Court on the basis of federal question jurisdiction. ECF 1; *see* 28 U.S.C. §§ 1331, 1441.

[2] Both Mr. Green and his wife are plaintiffs. I shall sometimes refer to Mr. Green as "plaintiff."

respectively.  ECF 17, ¶¶ 52-55, ¶¶ 56-59, ¶¶ 60-63. Count IV lodged a claim against Wexford for "Respondeat Superior."  *Id.* ¶¶ 64-65. Count V alleged a claim against all defendants for loss of consortium.  *Id.* ¶¶ 66-67.  Count VI, brought against all defendants under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), alleged violations of the Eighth and Fourteenth Amendments to the Constitution.  ECF 17, ¶¶ 68-76.  In Count VII, plaintiffs asserted a claim of "Gross Negligence" against all defendants.  *Id.* ¶¶ 77-83.

Wexford moved to dismiss or strike Counts VI and VII of the Amended Complaint.  ECF 21. I granted the motion to dismiss by Memorandum Opinion (ECF 26) and Order (ECF 27) of February 13, 2020. In my view, the Amended Complaint failed to include facts against Wexford sufficient to allege a violation of Green's constitutional rights. However, I also granted leave to amend Count VI.

Plaintiffs timely filed their Second Amended Complaint. *See* ECF 28. The SAC reiterates Counts I through VI of the Amended Complaint and includes additional facts as to Wexford. *See* ECF 28-1 (Redline version comparing SAC with Amended Complaint).

The individual defendants answered the Second Amended Complaint on March 18, 2020. ECF 30.  But, Wexford moved to dismiss Count VI of the SAC, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 29. The motion is supported by a memorandum of law. ECF 29-1 (collectively, the "Motion"). Plaintiffs oppose the Motion. ECF 33. Wexford has replied. ECF 34.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105(6).  For the reasons that follow, I shall deny the Motion.

## I.   Factual Background[3]

### A.  Green's Medical Treatment At CMCF

Prior to Mr. Brown's incarceration, he suffered a crush injury to his left leg.  ECF 28, ¶ 12. To treat chronic pain in his leg, Mr. Green had a nerve stimulator implanted in his low back/buttocks. *Id.*  The stimulator managed Green's chronic leg pain "to the point where he was able to perform most, if not all, activities of daily living pain free."  *Id.*

In 2015, Mr. Green was incarcerated at CMCF, a Maryland correctional institution.  *See id.* ¶ 8.  Wexford, a health care company, had a contract with the State of Maryland to provide medical services to prisoners in Maryland correctional facilities, including CMCF.  *Id.* ¶ 3.  Drs. Obsu, Onabajo, and Rizvi were employed by Wexford and worked at CMCF.  *Id.* ¶¶ 4-6.

On May 15, 2015, Green began experiencing "issues with his implanted nerve stimulator after he was required to walk through a metal detector at CMCF."  *Id.* ¶ 14. In particular, Green noticed that the simulator device was no longer working and that part of the wiring in his leg had become "dislodged." *Id.* Green claims that he immediately requested medical attention and was seen by the Wexford medical providers "several times" between May and June 2015. *Id.* ¶¶ 15, 16. During these visits, he alleges that he received over-the-counter anti-inflammatory medication and an ace bandage. *Id.* ¶ 15. Further, according to plaintiffs, none of Green's medical visits between May and June 2015 are documented in Wexford's electronic health record ("EHR"). *Id.* ¶ 16.

---

[3] I incorporate by reference all relevant background information as contained in my Memorandum Opinion of February 13, 2020. ECF 26. The facts set forth here are limited to those pertinent to the Motion, particularly the new factual allegations with respect to Wexford that appear in the SAC.

Given the procedural posture of the case, I shall assume the truth of the facts alleged in the Second Amended Complaint. *See* Fed. R. Civ. P. 12(b)(1); *see, e.g.*, *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Mr. Green presented to Dr. Rizvi on July 22, 2015, with a concern that his nerve stimulator had malfunctioned or dislodged. *Id.* ¶ 17.  Green also complained of knee pain and swelling, which had begun a few days earlier. *Id.*  This is the first visit to the medical department for Green that is documented in the EHR. *Id.* Dr. Rizvi noted that Green needed "urgent neurosurgical evaluation[.]" *Id.*  However, Dr. Rizvi allegedly "failed to communicate that finding to anyone or schedule that evaluation." *Id.*  Consequently, "no follow up neurosurgical evaluation was requested." *Id.*

On August 3, 2015, Mr. Green returned to CMCF's medical department for an evaluation of persistent pain in his left leg. *Id.* ¶ 18.  During the visit, Dr. Obsu ordered a CT scan of Mr. Green's leg, but the order "was never transmitted to the correct parties" and no CT scan was ever performed. *Id.*  ¶ 19.

Mr. Green saw Dr. Obsu again on August 17, 2015, complaining of ongoing pain in his left leg.  *Id.* ¶ 20.  Dr. Obsu diagnosed an abscess on Mr. Green's left knee, which he drained.  *Id.* ¶ 21. After prescribing an antibiotic for Mr. Green, Dr. Obsu discharged Mr. Green back to general housing. *Id.* According to plaintiff, Dr. Obsu's failure to schedule or recommend a surgical consultation was "[c]ontrary to the acceptable standards of medical care[.]"  *Id.* ¶ 22.

After more than a month of worsening symptoms, Mr. Green returned to the medical department on August 31, 2015.  *Id.* ¶ 23.  Mr. Green told medical staff that "he had been sweating so profusely that he felt like he was going to lose consciousness, and that he needed to have his blood pressure . . . checked."  *Id.*  Mr. Green also had a draining wound on his leg from his nerve stimulator, "which was warm and tender to the touch." *Id.*

During this visit, non-party Chika Ezenwachi, RN noted that Mr. Green was sweating profusely.  *Id.* ¶ 24.  Additionally, Dr. Onabajo noted swelling and ulceration on Mr. Green's thigh, toward the knee.  *Id.*  Records from the visit reflect that Mr. Green had a symptomatic fever, and that

Mr. Green was told to follow-up if his condition worsened or he had no improvement within four days. *Id.* ¶ 26.

Dr. Onabajo allegedly ordered Mr. Green to undergo several diagnostic tests, including several radiology exams and a complete blood panel. *Id.* ¶ 27. Dr. Onabajo also continued Mr. Green on "anti-inflammatory and cold medicine prescriptions." *Id.* ¶ 28. But, Mr. Green alleges that no tests were performed. *Id.* ¶ 27. And, despite Mr. Green "displaying obvious signs of an overwhelming bacterial infection," he released Mr. Green back to his cell to "suffer with tremors, severe diaphoresis, and incredible pain and discomfort[.]" *Id.* ¶ 29.

Mr. Green received no follow-up care until September 25, 2015, when he saw Dr. Rizvi. *Id.* ¶¶ 30-31. At the time, Mr. Green had a "lateral popliteal infection with pus draining from his left leg." *Id.* ¶ 31. Dr. Rizvi did not request a surgical consultation. *Id.* ¶ 32. Instead, Dr. Rizvi prescribed Zyvox, an antibiotic used to treat Methicillin-resistant Staphylococcus Aureas ("MRSA"), and returned Mr. Green to his cell. *Id.*

Mr. Green returned to the medical facility three days later. *Id.* ¶ 33. By this point, portions of Mr. Green's nerve stimulator were "protruding from his left leg." *Id.* Nurse Ezenwachi noted that wires from the nerve stimulator were sticking out of Mr. Green's leg. *Id.* ¶ 34. Nonetheless, Mr. Green was treated with an ace bandage, lotion, and ibuprofen, and then returned to his cell. *Id.* ¶ 35.

In sum, plaintiffs allege that Green visited the CMCF medical department at least seven times during the period from May through September 2015. *Id.* ¶ 62. And, "each time his symptoms had only worsened," but defendants "failed to act to diagnose or treat" them properly. *Id.* Further, plaintiffs claim that defendants "were aware that Mr. Green required immediate surgery, and that failing to promptly schedule the surgery, or at least a consultation with an outside specialist, would cause him harm." *Id.* ¶ 63.

5

On October 21, 2015, about one month after plaintiff's appointment in September 2015, Mr. Green underwent a "preoperative evaluation . . . in preparation for surgery to remove the defective nerve stimulator." *Id.* ¶ 36.  Following the evaluation, Mr. Green was seen by Charles Park, M.D. at Mercy Hospital in Baltimore. *Id.* ¶ 37. During the visit, Dr. Park "became alarmed" when he noticed Mr. Green had developed a "severe infection throughout his body." *Id.* Dr. Park ordered immediate IV antibiotics and further noted that Mr. Green should be scheduled "for urgent and immediate" surgery to remove the nerve stimulator once the infection was controlled. *Id.* ¶ 38.

Mr. Green received a peripherally inserted central catheter ("PICC") line sometime between November 3 and 5, 2015. *Id.* ¶ 39. And, Mr. Green was moved to the "Jessup Regional Infirmary" on November 6, 2015. *Id.* at ¶ 40.  Plaintiff alleges that during the transfer, the PICC line was "precariously hanging from [his] chest" and "left uncovered and exposed to the elements." *Id.*

On November 7, 2015, Mr. Green advised the attending doctor that the abscess had begun draining from the area where the nerve stimulator was protruding from his leg. *Id.* ¶ 41. Despite Mr. Green experiencing agonizing pain, Dr. Park advised Mr. Green that he had to complete the antibiotic treatment before surgery could be performed to remove the nerve stimulator. *Id.* Mr. Green remained in the infirmary for the next eleven days. *Id.* ¶ 42.  During this time, Mr. Green laid in bed in "tremendous pain, fearing for his life." *Id.*

Mr. Green underwent surgery at Mercy Hospital on November 18, 2015, to remove the nerve stimulator. *Id.* ¶ 43. Following the operation, on November 20, 2015, Mr. Green briefly returned to the infirmary before being discharged back to general housing at CMCF. *Id.* ¶ 44.  Mr. Green ambulated with crutches and received prescription narcotics. *Id.* ¶ 45.

Plaintiff was scheduled to be transferred to home detention on November 25, 2015. *Id.* ¶ 46. On that day, Mr. Green was transferred from CMCF to the Home Detention Unit ("HDU") in

preparation for his release and transition home.  *Id.*  However, when Mr. Green arrived at HDU, it was determined that he was medically unfit for home detention due to his receipt of narcotic pain medication.  *Id.* ¶ 47. Consequently, Mr. Green was returned to CMCF, where he was held for an additional three weeks beyond his scheduled release date.  *Id.*  ¶ 48.

According to plaintiffs, a "sick call is a prisoner's formal request for medical services." ECF 28-1 at 10 n.1. Plaintiffs allege that these requests are supposed to be reviewed daily, pursuant to Wexford's policies, documented in the EHR, and "immediately triaged by a certified medical health provider." *Id.*

Plaintiffs claim that Mr. Green filed numerous "sick call requests" and Administrative Remedy Procedure ("ARP") grievances[4] between May and November 2015 to alert defendants to the "insufficient medical care that he was receiving," his "degrading medical condition," and defendants' "failures to refer Mr. Green to an outside specialist." *Id.* ¶ 55. Further, they assert that defendants "did not adequately address these" requests and they were not all recorded in the EHR. *Id.*  Moreover, plaintiffs allege that defendants purposefully delayed referring Mr. Green to an outside specialist until after he was infected with MRSA in September 2015 because they "hope[d]" that Green "would be released from incarceration before his medical condition worsened." *Id.* ¶¶ 56, 57.

Plaintiffs contend that, as a result of defendants' failure to respond to Green's worsening condition, Green "endured extreme and unnecessary physical and emotional pain and suffering." *Id.* ¶ 58. In particular, it "exacerbated the other deficiencies in Mr. Green's medical care; namely, that he had a progressive untreated MRSA infection; he had to walk around with an exposed metal lead protruding from his left leg; he constantly feared permanent disability, disfigurement, or even death;

---

[4] ARPs are used by Maryland prisoners to bring complaints related to their conditions of confinement, including complaints about medical care. ECF 28-1 at 10 n.2.

and he experienced heightened symptoms of depression and anxiety." *Id.* Moreover, Mr. Green alleges that he "will continue to suffer, painful and permanent bodily injury, mental anguish, and other related injuries[.]" *Id.* ¶ 52.

### B.   Wexford's Alleged Policies and Practices

Plaintiffs claim that Wexford's contract with the State of Maryland "contained financial incentives that encourage[d] Wexford to reduce outpatient referrals and hospitalizations of prisoners in outside facilities." *Id.* ¶ 59. They posit that Wexford was paid a flat fee of $598 million for the five-year duration of its contract with the State of Maryland, regardless of the care or services Wexford rendered to the inmates. *Id.* ¶ 61. Therefore, according to plaintiffs, Wexford tried to "minimize the cost of medical care it provided to all Maryland prisoners, including Mr. Green." *Id.*

Moreover, according to plaintiffs, Wexford's "treatment policies encourage[d] conservative care to cut costs," so Wexford employees "with[e]ld necessary medical care from prisoners with serious medical conditions requiring outside care or costly medications." *Id.* ¶ 59. And, according to plaintiffs, Wexford had an "extensive" procedure for approving referrals that "require[d] several stages of approval before a prisoner c[ould] be approved for outside care." *Id.* In fact, plaintiffs claim that Wexford trained its employees "to implement its cost-cutting policies and procedures." *Id.* ¶ 72.

Further, plaintiffs allege that "the delays in referring Mr. Green to an outside specialist, scheduling his surgery, and approving his medications were motivated in part" by the financial incentives of Wexford's contract with Maryland and its policies for approving "outside care or costly procedures and medications" for prisoners. *Id.* ¶ 60.

In addition, plaintiffs claim that "Wexford maintained official policies and actual practices that were deliberately indifferent to prisoners' serious medical needs." *Id.* ¶ 64. More specifically, according to plaintiffs, "Wexford routinely refused to follow the orders and recommendations of

outside physicians; routinely delayed or failed to order diagnostic testing; routinely delayed or cancelled prisoners' scheduled appointments with medical professionals, often without explanation; routinely delayed in responding to medical grievances; and routinely delayed or denied important and necessary medical procedures." *Id.*

Plaintiffs contend that at least five states, including Maryland, terminated their prison healthcare contracts with Wexford between 2007 and 2018 because of "Wexford's inadequate medical care." *Id.* ¶ 65. According to plaintiffs, the contracts were terminated because of Wexford's "cost-cutting policies of delaying or failing to refer prisoners to outside specialists and diagnostic evaluations; understaffing and failure to properly train its medical providers; failures to respond to sick calls and grievances; and inadequate medical record keeping." *Id.* And, in Maryland, "Wexford's failures in Maryland not only caused the State to terminate its contract, but also resulted in over $15 million of liquidated damages for understaffing and errors in the provision of patient care—penalties that Wexford did not protest." *Id.* ¶ 70.

Plaintiffs cite to reports and jury verdicts in matters involving Wexford in other jurisdictions as evidence of this "persistent and widespread practice of denying prisoners adequate medical treatment." *Id.* ¶ 99; *see id.* ¶¶ 66-68 (citing Final Report of the Court Appointed Expert, Ron Shansky, MD et al., at 3, *Lippert v. Godinez*, No. 1:10-cv-04603 (N.D. Ill. Dec. 2014), *accessible at* https://www.clearinghouse.net/chDocs/public/PC-IL-0032- 0007.pdf; *Hall v. Funk, et al.*, No. 14-C-06308 (N.D. Ill. Apr. 2018)).  Plaintiffs also point to Wexford's website as "tout[ing] its cost-cutting policies regarding offsite specialist referrals, inpatient hospital admission, and expedited discharge from offsite facilities." *Id.* ¶ 69.

## II.    Standard of Review

9

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting

*Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."  *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa.*

*Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id*. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As noted, plaintiffs cite several other cases, reports, and a website in the SAC. ECF 28, ¶¶ 66-69. All of these documents are publicly available and their authenticity is not contested. Therefore, I may consider them in resolving the Motion.

### III.   Discussion

Under Count VI, plaintiffs lodge claims pursuant to 42 U.S.C. § 1983.  *See* ECF 28, ¶¶ 90-100.  They assert that defendants denied medical care to Mr. Green, in violation of the Eighth Amendment or the Fourteenth Amendment to the Constitution.[5]

Wexford argues that the Court should dismiss Count VI of the SAC because plaintiffs have failed plausibly to allege that Wexford had a policy, custom, or practice of deliberate indifference with regard to the serious medical needs of CMCF inmates.  ECF 29-1 at 9-12.

### A.  § 1983 Generally

Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was

---

[5] I pause to note that the Fourteenth Amendment protects the rights of pretrial detainees, whereas the Eighth Amendment applies to convicted prisoners.  *See, e.g.*, *Brown v. Harris*, 240 F.3d 383, 388-89 (4th Cir. 2001).  It appears that Mr. Green was serving a sentence at the relevant time.

committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Loftus v. Bobzien*, 848 F.3d 278, 284-85 (4th Cir. 2017); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips*, 572 F.3d at 180 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

Section 1983 also requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). Thus, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials in § 1983 claims "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged

offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilcox*, 877 F.3d at 170.

### B.  Deliberate Indifference

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *King v. Rubenstein,* 825 F.3d 206, 218 (4th Cir. 2016).   Notably, it "proscribes more than physically barbarous punishments." *Estelle*, 429 U.S. at 103.  It also "embodies" the "'concepts of dignity, civilized standards, humanity, and decency . . . .'"  *Id.* (citation omitted).  Thus, the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned."  *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996); *cf. De Shaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 989 U.S. 189, 199-200 (1989) (stating that when a state holds a person "against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being"); *John Doe 4 v. Shenandoah Valley Juvenile Center Comm'n*, ___ F.3d ___, 2020 WL 8028611, at *9 (4th Cir. Jan. 12, 2021).

The Fourth Circuit has observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'"  *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Thompson*, 878 F.3d at 97.

16

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley*, 475 U.S. at 319-20; *see Farmer*, 511 U.S. at 832; *Raynor*, 817 F.3d at 127. "It is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (citation omitted).

The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38).

Of relevance here, in order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F. 3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178. Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure the needed care was available. *See Farmer*, 511 U.S. at 837; *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a

doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).  Proof of an objectively serious medical condition, however, does not end the inquiry. As the Court explained in *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017), "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.  Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Similarly, the Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.").

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'"  (Citation omitted).  Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"  *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).  "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care."  *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (emphasis in *Formica*).

Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference."  *Id.*; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.").  Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation.  *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, *supra*, 429 U.S. at 106).  Further, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."  *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury.  Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'"  *Heyer*, 849 F.3d at 210 (quoting *Farmer*, 511 U.S.

at 837) (emphasis added in *Heyer*); *see Thompson*, 878 F.3d at 97-98.  But, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835).  A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).  In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice*, 58 F.3d at 105.

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard.  *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977).  Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems.  *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 F. App'x 860 (4th Cir. 2012).

In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal

quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct 1970).  Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs."  *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

## C.  *Monell*

A local government entity is subject to suit under § 1983.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The Supreme Court determined in *Monell* that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights.  *Id.* at 690-91.  The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983."  *Id.* at 694; *see Love-Lane*, 355 F.3d at 782.  But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017).

Of import here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West*, 487 U.S. at 49; *Polk Cty. v.*

*Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co., Inc.*, 338 F.3d 348, 355 (4th

Cir. 2003); *Austin v. Paramount Parks, Inc*., 195 F.3d 715, 728 (4th Cir. 1999).  Standards applicable

to municipalities are also applicable to private corporations acting under color of state law. *See*

*Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "'apply equally to

a private corporation'" acting under color of state law) (citation omitted).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in

*Connick*) (internal citations omitted):

> A municipality or other local government may be liable under [§ 1983] if the
> governmental body itself "subjects" a person to a deprivation of rights or "causes" a
> person "to be subjected" to such deprivation. But, under § 1983, local governments
> are responsible only for "their *own* illegal acts." They are not vicariously liable under
> § 1983 for their employees' actions.

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an

unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of

the plaintiff's constitutional rights.  *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397,

403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S.

1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

The Fourth Circuit reiterated in *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d

379 (4th Cir. 2014), *cert. denied*, 575 U.S. 983 (2015), that, to establish a *Monell* claim, the plaintiff

"must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and

frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the

conduct, and (2) failed to correct it due to their 'deliberate indifference.'"  *Id.* at 402 (quoting *Spell*,

824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose

liability on a municipality must . . . adequately plead and prove the existence of an official policy or

custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction

in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (internal citations omitted).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997).

### D.  Analysis

Wexford argues that the Second Amended Complaint fails adequately to state a *Monell* claim because the SAC "relies exclusively on bare, conclusory language mimicking the terminology of a *Monell* claim rather than on factual allegations." ECF 29-1 at 9. According to Wexford, the only facts the plaintiffs plead "that could possibly touch on the existence of a policy are only tangential and would apply to any for-profit business." *Id.* Further, Wexford posits that "[n]one of the citations to unrelated matters in the second amended complaint are allegations of fact"; rather, "they are nothing more than 'scattershot accusations of unrelated constitutional violations.'" *Id.* at 12 (quoting *Carter*, 164 F.3d at 218).

In contrast, plaintiffs argue that their *Monell* claim against Wexford makes "three primary allegations": (1) "that Wexford has a practice of denying emergency medical requests and related grievances"; (2) "that Wexford has a policy of denying prisoner referrals to outside physicians for diagnostic testing as a cost-cutting measure"; and (3) "that Wexford has a policy of delaying necessary

medical care to prisoners…when they have a release date in the not-too-distant future, like here." ECF 32 at 1. And, plaintiffs assert that if they "can demonstrate any one of the three aforementioned theories against Wexford, they will have proven the existence of a formal policy, or a widespread pattern and practice" sufficient to allege a *Monell* claim. *Id.*

In my view, the SAC pleads an adequate *Monell* claim against Wexford. Plaintiffs allege that, as a result of certain financial incentives, Wexford implemented "cost-cutting policies and procedures that discouraged, *inter alia*, outpatient care or costly procedures and medications," thereby depriving prisoners of necessary medical care. ECF 28, ¶ 72; *see id.* ¶¶ 59-61, 64. And, plaintiffs assert that Wexford trained its medical providers to perform those cost-saving actions. *Id.* ¶ 72. Further, plaintiffs allege facts as to causation by asserting that, despite Green's repeated complaints of his worsening condition, and notwithstanding the doctors' recognition that Mr. Green needed additional diagnostic tests, the medical defendants failed to conduct follow-up evaluations or refer Mr. Green to an appropriate outside health care provider. *Id.* ¶¶ 17, 59-62.

Moreover, plaintiffs claim that "Wexford's pattern and practice of refusing or delaying appropriate medical care to prisoners is not unique to CMCF, or even to Maryland prisoners." *Id.* ¶ 65. They cite investigative reports, jury verdicts, and Wexford's website as evidence of Wexford's cost-cutting policies and its detrimental impact on medical care for prisoners. *Id.* ¶¶ 66-69. According to plaintiffs, as "a result of Wexford's aforementioned failures, Mr. Green sustained serious and permanent physical and emotional injuries," which is "another example of [Wexford's] persistent and widespread practice of denying prisoners adequate medical treatment." *Id.* ¶¶ 98, 99.

The allegations describe a policy on the part of Wexford—in particular, the denial of needed medical care out of budgetary concerns—that, if proven, infringed on Mr. Green's Eighth Amendment rights, as discussed, *supra*. Courts have regularly found that where, as here, a corporate

entity such as Wexford is alleged to maintain a policy sanctioning the denial of needed medical care as a result of financial considerations, the entity may be liable for a violation of an inmate's constitutional rights. *See, e.g.*, *Robinson v. Corizon Health Inc.*, No. 12-1271, 2016 WL 7235314, at *7 (E.D. Pa. Dec. 13, 2016) (concluding prisoner stated plausible *Monell* claim by alleging that medical providers diagnosed kidney cancer, but refused to refer to offsite doctors because they received financial bonuses for avoiding use of such measures); *Dupree v. Doe*, No. 10-351, 2012 WL 2087788, at *2 (D. Del. June 7, 2012) (finding that a liberal construction of the complaint showed that plaintiff properly pled a policy, custom, or practice of placing cost containment ahead of providing necessary medical care); *Young v. Wexford Health Sources*, No. 10-C-8220, 2012 WL 621358, at *6-7 (N.D. Ill. Feb. 14, 2012) (denying Wexford's motion to dismiss where plaintiff alleged Wexford's cost-cutting policy was responsible for his inadequate treatment); *McDonald v. Wexford Health Sources,* No. 09-C-4196, 2012 WL 3034529, at *3 (N.D. Ill. July 30, 2010) (same).

Further, as the Supreme Court has explained, evaluating a complaint under Rule 12(b)(6) is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In the context of *Monell* liability, it will often be the case that a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery is conducted. Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers. *See Owens*, 767 F.3d at 403 ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."); *Jordan by Jordan v. Jackson,* 15 F.3d 333, 340 (4th Cir. 1994) (holding that to survive motion to dismiss, a *Monell* claim need only provide the municipality with "notice of the nature of the claim against them and the grounds on which it rests"); *Ulloa v. Prince George's Cty.*,

DKC-15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) (requiring that the plaintiff "pair general averments of a policy or custom with particular examples" to state a *Monell* claim); *see also Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019) ("[T]the details of the alleged policy or custom ... is a topic properly left to development through discovery. It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork.").

Thus, at this early juncture, I conclude that plaintiffs have sufficiently alleged a *Monell* claim against Wexford.

## IV.   **Conclusion**

For the reasons stated above, I shall DENY the Motion (ECF 29).

An Order follows, consistent with this Memorandum Opinion.


Date: January 19, 2021

                          _____/s/_____
                          Ellen L. Hollander
                          United States District Judge