IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARRON K. GREEN, *et al.*,

    *Plaintiffs*,

v.

MULETA T. OBSU, M.D., *et al.*,

    *Defendants*.

Civil Action No.  ELH-19-2068

**MEMORANDUM OPINION**

This case arises from alleged inadequate medical treatment provided to plaintiff Darron K. Green, while he was a prisoner in the Central Maryland Correctional Facility ("CMCF").  ECF 17 (the "Amended Complaint"); ECF 28 (the "Second Amended Complaint" or "SAC").  Through counsel, Green and his wife, Lolita Munir, have sued defendants Wexford Health Sources, Inc. ("Wexford") and three physicians employed by Wexford: Muleta T. Obsu, M.D.; Bolaji Onabajo, M.D.; and Syed Rizvi, M.D.  ECF 28, ¶¶ 1-6.

Defendants have filed a post-discovery motion for summary judgment.  ECF 56.  The motion is supported by a memorandum (ECF 56-1) (collectively, the "Motion") and several exhibits.  ECF 56-2 to ECF 56-10.  Plaintiffs oppose the Motion (ECF 59, the "Opposition"), together with exhibits.  ECF 59-1 to ECF 59-3.  Defendants have replied (ECF 60, the "Reply"), and submitted two additional exhibits.  ECF 60-1; ECF 60-2.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

I.       **Factual and Procedural Background**

A.   **Procedural Posture**

Suit was filed by Green and Munir, through counsel, in the Circuit Court for Baltimore City on August 17, 2018.  ECF 3 ("Complaint").  The case was then transferred to the Circuit Court for Howard County.  ECF 1-13.  While in State court, the parties conducted discovery.  *See* ECF 1-10; ECF 1-18; ECF 1-25; ECF 1-26; ECF 1-27. Plaintiffs amended their Complaint on June 27, 2019, adding a count under 42 U.S.C. § 1983.  *See* ECF 17.  Thereafter, on July 15, 2019, Wexford removed the case to this Court on the basis of federal question jurisdiction.  ECF 1 ("Notice of Removal"); *see* 28 U.S.C. §§ 1331, 1441.

After removal, Wexford moved to dismiss or strike certain counts in the Amended Complaint.  ECF 21.  By Memorandum Opinion (ECF 26) and Order (ECF 27) of February 13, 2020, I granted the motion to dismiss, but also granted leave to amend.  Plaintiffs subsequently filed the SAC.  ECF 28.

The SAC contains six counts.  Counts I, II, and III assert negligence claims against Dr. Obsu, Dr. Onabajo, and Dr. Rizvi, respectively.  *Id*. ¶¶ 74-85.  Count IV lodges a claim against Wexford for "Respondeat Superior," premised on the negligence allegations in Counts I, II, and III.  *Id*. ¶¶ 86-87.  Count V asserts a claim against all defendants for loss of consortium.  *Id*. ¶¶ 88-89.  Finally, Count VI, brought under 42 U.S.C. § 1983 against all defendants, alleges deliberate indifference to Green's medical needs, in violation of the Eighth and Fourteenth Amendments to the Constitution.  *Id*. ¶¶ 90-100.  Initially, the count included a claim against Wexford under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  However, with Wexford's consent, plaintiffs dismissed Wexford from Count VI, thereby withdrawing their *Monell* claim.  *See* ECF 46; ECF 47.  Thus, Count VI is now pending only against Dr. Obsu, Dr. Onabajo, and Dr. Rizvi.

The individual defendants answered the SAC.  ECF 30.  But, Wexford again moved to dismiss Count VI of the SAC.  ECF 29.  By Memorandum Opinion (ECF 35) and Order (ECF 36) of January 19, 2021, the Court denied the motion.  Thereafter, Wexford answered the SAC (ECF 37), and the parties engaged in discovery.  *See* ECF 42; ECF 53.  As noted, plaintiffs subsequently withdrew Count VI as to Wexford.

### B.  Timeline of Events[1]

Following a plea of guilty in the Circuit Court for Baltimore County to vehicular manslaughter, Green was sentenced on October 21, 2013, to ten years of imprisonment, with all but four years suspended.  ECF 56-3 ("State's Version of Offense") at 1; ECF 56-5 ("Commitment Record") at 1.[2]  According to the State's Version of Offense, on February 20, 2010, Green was driving a Ford F-150 pickup truck in Baltimore when he crossed the median and collided with a vehicle going in the opposite direction, in a "near head on collision."  ECF 56-3 at 1.  Green, as well as the driver and passenger of the other vehicle, sustained serious injuries and were taken to the hospital.  *Id*.  The driver of the other vehicle died four days later.  *Id*.  While at the hospital, blood was drawn from Green, and it was determined that his blood alcohol content was 0.18.  *Id*.

---

[1] In this section, I recount the events relating to the alleged inadequate medical treatment. In the Opposition, plaintiffs state that they "accept the facts set forth" in the factual background section of the Motion, "except as modified or amended . . . ."  ECF 59 at 2.  Therefore, I primarily recount the facts as set forth in that section of the Motion, as well as the supporting exhibits.  *See* ECF 56-1 at 1-8.

Throughout the Memorandum Opinion, I cite to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[2] The record is clear that Green was sentenced on October 21, 2013, but it is not clear if Green also entered his guilty plea on that day. This issue is not material.

As described by Green during his deposition, his left leg was "[c]rushed;" his femur was exposed; his jaw and right rib were broken; his lungs collapsed; his forehead was "[s]plit" between his eyes; and his lip was also "split."  ECF 56-1 (Green Depo.) at 2 (Tr. at 16).  In the immediate aftermath of the accident, Green spent "[p]robably over 30 days," by his estimation, at the University of Maryland Shock Trauma Center, where he underwent 16 surgeries.  *Id*. at 3-4 (Tr. at 17-18).  Following these surgeries, Green experienced chronic plain.  *Id*. at 4-5 (Tr. at 18-19).   In order to help manage the pain, a nerve stimulator was implanted in Green's lower back and left leg in 2013, requiring three or four surgeries at Mercy Medical Center.  *Id*.; ECF 56-6 ("Office of Inmate Health Services" medical records for Green) at 19.[3]

The medical issues that are the subject of this suit occurred in 2015, while Green was incarcerated at CMCF.[4]  Green testified that he began noticing bruising and thinning of the skin on his left leg in March or April of 2015.  ECF 59-2 (Green Depo.) at 3 (Tr. at 38-40).  He testified that around this time, he felt a warm sensation inside his left leg, and began developing pain and fevers.  *Id*. at 3 (Tr. at 39-40), 6 (Tr. at 51-52).  According to Green, he reported these symptoms to prison nurses, whom he saw twice a day because he was on medication.  *Id*. at 4 (Tr. at 41-42).  He identified two nurses: a female nurse named "Ms. Chika" and a male nurse named "Mike."  *Id*. (Tr. at 41-44).  Other materials identify "Ms. Chika" as Chika Ezenwachi, R.N (*see, e.g.*, ECF 56-6 at 7), but I have not ascertained the identity of "Mike" in the materials provided to the Court.

---

[3] The briefing refers variously to a "nerve stimulator," "peripheral nerve stimulator," or "neurostimulator." The terms are interchangeable for the purpose of the Motion. It is unclear from the record if implanting the nerve stimulator required three or four surgeries, but this issue is immaterial.

[4] The name of CMCF changed from the "Central Laundry Facility" to CMCF during Green's time there. *See* ECF 56-1 at 3 n.1; ECF 59-2 (Green Depo.) at 5 (Tr. at 48). For simplicity, I refer to the institution solely as CMCF.

Green testified that "Ms. Chika" was "concerned" and encouraged him to fill out a "sick call" to request medical attention, which he did.  ECF 59-2 (Tr. at 42); *see id*. at 4-5 (Tr. at 43-46). Green's first documented medical visit related to this issue occurred on July 22, 2015, when he saw Dr. Rizvi.  ECF 56-6 at 1-2.[5]  According to the medical records for the visit, Green told Dr. Rizvi that there had recently been "5-6 days of pain and swelling at posterior tebial site of lead incertion [sic]."  *Id*. at 1.  Green also indicated that he was "concerned that [the stimulator] may have been dislodged."  *Id*.  Dr. Rizvi wrote, *id*.: "Need urgent eval."  However, Dr. Rizvi noted, *id*.: "NO clinical signs of infection."  (Capital letters in original.)  But, at his deposition, Green maintained that his wound was infected, "[b]ad."  ECF 59-2 at 7 (Tr. at 54).

Dr. Rizvi requested a neurosurgery consultation to evaluate the "[p]ossible dislodgement of peripheral lead."  ECF 56-6 at 1; *see also id*. at 27.  This request was conveyed to Asresahegn Getachew, M.D.  The Motion describes Dr. Getachew, who is not a defendant, as the "utilization management physician" (ECF 56-1 at 3), and the Opposition does not dispute this characterization. He approved the request via email on July 23, 2015.  ECF 56-6 at 55.

The Opposition states: "Dr. Rizvi listed the wrong hospital (Bon Secours instead of Mercy Medical Center) when he submitted his urgent surgical consultation request for approval."  ECF 59 at 6 (citing ECF 56-6 at 57.)  The cited medical record reflects that Dr. Rizvi listed Bon Secours as the "Factility/Prov" in his consultation request.  ECF 56-6 at 57.  The Opposition does not offer any additional explanation as to why this was the "wrong hospital," but other medical records

---

[5] The Second Amended Complaint alleges that Green had medical visits with "Wexford medical providers" in May and June of 2015 related to this issue, but that they are not documented in Wexford's electronic health record system. ECF 28, ¶¶ 15-16.  No records of any such visits have been produced in the summary judgment materials, and the Opposition does not identify any visits that occurred before July 22, 2015. *See* ECF 59 at 3. And, at his deposition, Green appeared to acknowledge that Dr. Rizvi was the first physician he saw at CMCF regarding this issue, on July 22, 2015. ECF 59-2 at 6 (Tr. at 49-50).

indicate that Charles Park, M.D., who ultimately performed the consultation, worked at Mercy Medical Center.  *See, e.g.*, ECF 56-6 at 28.  However, no evidence or material has been provided as to what effect, if any, the designation of Bon Secours might have had on subsequent events, and no evidence has been provided indicating that this designation did, in fact, cause any delay.

In any event, it is undisputed that Green was not seen by a neurosurgeon until approximately three months later, on October 30, 2015.  *Id.* at 27-33.  But, medical records reflect that on July 24, 2022, soon after plaintiff was seen by Dr. Rizvi, a "CT [scan] of [Green's] lower leg" was approved by Dr. Getachew.  *Id.* at 56.  Dr. Getachew noted that Green had a "possible dislodgement of peripheral lead (neurostimulator)."  *Id.*  And, on August 3, 2015, Dr. Obsu generated a consult request for Green's CT scan, which Dr. Getachew had already approved.  *Id.* at 3-4.

According to the Motion, Dr. Getachew ordered the CT scan because he "decided that a CT study of Green's left leg should be done before the neurosurgery consult to determine the status of the peripheral nerve stimulator and whether it had become dislodged."  ECF 56-1 at 3 (citing ECF 56-6 at 55-57).  However, the cited records do not explicitly indicate that this was the reason for approval of a CT scan.  Rather, they indicate only that Dr. Getachew approved it.  The Opposition does not appear to dispute that this was the reason why Dr. Getachew ordered the CT scan.  Instead, plaintiffs emphasize the three-month gap between July 22, 2015, and October 30, 2015, and argue, *inter alia*, that the delay was improper.  *See* ECF 59 at 3, 6-8.

Over the next several months, Green had a series of encounters with health care providers, including the individual defendants.  On August 17, 2015, Green was seen by Dr. Obsu.  ECF 56-6 at 5-6.  Dr. Obsu noted a draining abscess on Green's left knee, and observed that the left knee

had "swelling" and "tenderness." ECF 56-6 at 5. Dr. Obsu ordered wound care and sterile dressing for the knee and prescribed Bactrim DS, an oral antibiotic. *Id*. at 5-6.

Then, Green was seen by Dr. Onabajo on August 31, 2015. *Id*. at 9-10. The record indicates that Green told Dr. Onabajo that he had been sweating for around a month. *Id*. at 9. Dr. Onabajo noted that Green had "no other complaints," and no fever, chills, cough, nausea, vomiting, diarrhea, chest pain, shortness of breath, or weight changes. *Id*. Green's temperature was recorded as 97.7 degrees. *Id*. But, Dr. Onabajo indicated that Green had "[s]weating fever." *Id*. Dr. Onabajo also recorded that Green had a "wound on the left thigh," which was "swollen with area of ulceration and minimal drainage," and was "warm / tender." *Id*. at 9-10. He ordered labs and x-rays, and indicated that a follow-up should occur if there was no improvement within four days. *Id*. at 10.

A medical entry completed the same day by Ezenwachi reflects that Green said, *id*. at 7: "'I need my blood pressure checked i have been sweating so baddly I feel like am going to pass out.'" (Reproduced as in original.) In addition, Ezenwachi wrote: "[N]o acute distress [patient] denies any pain at this time." *Id.*

X-rays were taken of plaintiff on the same date, August 31, 2015, and interpreted by a radiologist on September 9, 2015. *Id*. at 50-51.[6] The radiologist wrote, *id*. at 50: "Frontal view of the chest demonstrates clear lung fields. Mediastinal structures and cardiac silhouette are within normal limits. No gross osseous abnormality noted. Impression: No acute disease[.]" The Motion states that the x-rays "did not reveal any problem with the peripheral nerve stimulator." ECF 56-1 at 4 (citing ECF 56-6 at 50-51). The Opposition does not dispute this characterization of the x-ray results.

---

[6] It is unclear from the record where the x-rays were taken.

Green's lab results give a "date collected" of September 10, 2015, and a "date resulted" of September 12, 2015. ECF 56-6 at 47-49. The Motion asserts that the "lab results . . . indicated that Green did not have a systemic infection." ECF 56-1 at 4. The Opposition does not dispute this characterization of the lab results.

On September 17, 2015, Green underwent a CT scan of his left leg at Bon Secours Hospital. ECF 56-6 at 52-53. The CT scan, which had been approved in July 2015, noted "what appears to be electrical stimulation apparatus in the posterior soft tissues just above the knee." *Id.* at 52. The Motion states, ECF 56-1 at 4-5: "The CT imaging was unremarkable and did not reveal any problems with the peripheral nerve stimulator hardware in Greens' [sic] leg." The Opposition does not dispute this characterization of the CT scan results.

Green's next medical visit was with Dr. Rizvi on September 25, 2015. ECF 56-6 at 12-13. Dr. Getachew and "Dr Atanafo [sic]" participated via telemedicine. *Id.* at 12. According to the Motion, "Dr. Atanafo" refers to "Dr. Gedion Atnafu, M.D.," an "infectious diseases specialist," who is not a defendant. ECF 56-1 at 5. The Opposition does not contest this description. The reason for the visit was Green's "Leg Infection," specifically his "lateral popletial leg infection," "with pus draining." ECF 56-6 at 12.

The medical record for the visit notes that Green had "[n]o fever" and his vitals were "stable." *Id.* He had finished a round of Bactrim DS two weeks prior. *Id.* The physicians assessed the leg infection as a "chronic infection" and recommended starting Green on Zyvox, another antibiotic. *Id.* According to the record, "Dr Temesgen" and Dr. Getachew planned to "talk to Surgen [sic] at Mercy hospital for removal of hard wear. Patient ok with it." *Id.* The Motion identifies "Kasahun Temesgen, M.D.," who is not a defendant, as the "Regional Medical Director,"

although it does not specify the institution where he held that position.  ECF 56-1 at 5.[7]  The Opposition does not dispute this identification.

On September 28, 2015, Green presented to Ezenwachi, stating, ECF 56-6 at 14: "'The neurstimulator [sic] thing on my leg is coming out."  According to Ezenwachi, Green had "a catheter protruding from the lateral left side of the leg above the knee."  *Id*.  Ezenwachi wrote that Green had been scheduled to see a neurologist on October 2, 2015, because the device, according to Green, "is coming out and is not working."  *Id*.  Ezenwachi continued, *id*.: "Dr Onabajo made aware he directed that I call Dr Temesegen [sic], and Dr Temesegen [sic] ordered for [patient] to be seen by the provider tomorrow for a [follow up]."

There is nothing in Green's medical records indicating that he had a follow up on September 29, 2015, or that he saw a neurologist on October 2, 2015.  Nor is there any information to indicate why he might not have had a follow up or been seen by a neurologist, nor why at least some of his medical providers were apparently under the impression that he had an appointment for October 2, 2015.  The Motion asserts, ECF 56-1 at 5: "There is, however, no evidence that any of the defendants is responsible for Green not seeing a neurologist that day."  Although plaintiffs fault the defendants for failing to ensure that Green had a more prompt neurosurgical evaluation, *see* ECF 59 at 2-3, 5-8, they do not specifically mention the issue of any follow up on September 29, 2015, or any appointment for October 2, 2015.

Green again saw Dr. Rizvi on October 21, 2015.  ECF 56-6 at 15-16.  The reasons for the visit were "Pain Management," as well as to conduct a preoperative evaluation for Green's planned surgery to remove his stimulator.  *Id*. at 15.  By that time, Green had just finished a round of Zyvox.

---

[7] The medical record actually states: "Dr Temesgena dn Dr Getachew will talk to . . . ." ECF 56-6 at 12. Presumably, this is a typographical error, and the writer intended to say "Dr Temesgen and Dr Getachew . . . ."

ECF 56-6 at 15.  Dr. Rizvi noted that Green's left knee wound looked "much better with much less dranage [sic]." *Id*.  There was pain on the "lateral side of [the] left knee," but it was "much better." *Id*.  Furthermore, a wire was no longer visible.  *Id*. at 16.  Other than "leg pain," Green had no complaints.  *Id*. at 15.  And, he was able to walk from his cell to the clinic without any problem. *Id*.

Dr. Rizvi wrote that there were "no major" contraindications for surgery, and Green's "labs from 10/1 are normal," but noted that "aneasthesia [sic]" would need to conduct its own preoperative evaluation.  *Id*.  The medical record for this visit suggests that although Green had not yet had his neurosurgery consultation, surgery to remove his stimulator was already scheduled or at least planned.  However, no records have been provided that reflect such scheduling prior to this medical appointment.

As noted, Green ultimately had his neurosurgery consultation on October 30, 2015, with Charles Park, M.D., at Mercy Medical Center.  *Id*. at 28-33.  Dr. Park is not a defendant.  In his consultation record, under "Assessment/Plan," Dr. Park wrote the following, *id*. at 30 (reproduced as in original):

Will need to have a PICC line[8] placed ASAP and antibiotics started

Left leg infected for 3 months
Will need removal of peripheral nerve stim
Will schedule asap

All the risks benefits alternatives were explained.

---

[8] The term "PICC" is used but never defined in the Motion. But, the Court notes that it refers to "peripherally inserted central catheter," *i.e.*, a type of intravenous access. *See Peripherally inserted central catheter (PICC) line*, MAYO CLINIC (July 22, 2021), https://www.mayoclinic.org/tests-procedures/picc-line/about/pac-20468748.

In other words, Dr. Park recommended that intravenous ("IV") antibiotics be used to treat Green's infection, and that the surgery not occur until after completion of the antibiotics. Although the parties use somewhat different language to describe the situation, this recommendation is not disputed. *See* ECF 56-1 at 6; ECF 59 at 3.

Green saw Dr. Onabajo on November 3, 2015. ECF 56-6 at 17-18. This was a follow-up visit to Green's consultation with Dr. Park. *Id*. at 17. Dr. Onabajo noted a "[s]mall area of wound on the lateral aspect of the left thigh with purulent discharge though no surrounding redness." *Id*. at 18. He recorded that Green was awaiting PICC placement, and "scheduling for the removal of the peripheral nerve Stimulator." *Id*. The next day, Dr. Getachew approved, via email, an "[u]rgent request" by Dr. Onabajo for PICC line insertion. *Id*. at 54.

Also on November 3, 2015, Green saw Laura Bontempo, M.D., at the University of Maryland Medical Center for a "Wound Check." *Id*. at 36; *see id*. at 35-37. Dr. Bontempo is not a defendant. Summarizing the visit, Dr. Bontempo wrote, in part, *id*. at 36:

> You were seen in the ED[9] for evaluation of the wound on your left leg. The wire from your nerve stimulator has eroded through the skin. The area looks irritated but does not appear acutely infected. Please continue the zyvox antibiotic that you are taking. Your lab work and vital signs are reassuring. The x-rays of your leg and pelvis do not show any breaks in the wiring in your leg. Please continue with your plan to follow-up with neurosurgery for removal of the nerve stimulator. Return to the ED for temp>101, redness around the wound, worsening pain or for any other concerns.

Green had a PICC line placed at Bon Secours Hospital on November 4, 2015. *Id*. at 39-40. Thereafter, he was transferred to Jessup Regional Infirmary ("JRI") to complete a course of an intravenous antibiotic, *i.e.*, vancomycin. *Id*. at 19-20. On November 16, 2015, Melaku Ayalew, M.D., a physician at JRI who is not a defendant, noted that Green had completed his course of

---

[9] "ED" is not defined in the briefing. I assume it is an abbreviation for "Emergency Department."

vancomycin and was scheduled to have his simulator removed.  ECF 56-6 at 19.  Dr. Ayalew wrote that Green "denies leg pain" and was a "[h]ealthy looking inmate without any form of ditress [sic]."  *Id*.  But, he also recorded: "Lt lower lateral thigh leads sticjking [sic] out no drainage or abscess noted[.]"  *Id*.

Dr. Park successfully performed surgery to remove Green's nerve stimulator on November 18, 2015, at Mercy Medical Center.  *Id*. at 40-46.  Dr. Park's "Neurosurgery Operative Notice" states, in part, *id*. at 40-41: "The patient is a man who had a previous placement of nerve stimulator for intractable pain and the wires came out on the left leg with infection.  At this point, the patient requests to have it removed. . . . The patient tolerated the procedure well.  There were no apparent complications."  Dr. Park prescribed oxycodone to manage Green's post-surgery pain.  *Id*. at 45.

After the surgery, Green was transferred to JRI.  *Id*. at 21-23.  And, on November 20, 2015, Green was transferred to the general population at CMCF.  *Id*. at 24-25.  In a medical visit record dated November 20, 2015, Dr. Onabajo noted that Green had a "[w]ound present on the left thigh/gluteal areas," and used crutches to walk.  *Id*. at 24.  He indicated that the wound was "[i]mproving."  *Id*. at 25.

Green was transferred to the Central Home Detention Unit ("CHDU") on November 25, 2015.  *Id*. at 26.  However, an "Administrative Note" completed by Sonja Wilson, M.D. at CHDU indicates that, on this date, Green was still taking his oxycodone.  *Id*.  Sonja Wilson is not a defendant.  Narcotics are not permitted on home detention.  *Id*.  As a result, Green would be "sent back to his previous facility" (*i.e.*, CMCF) until he was "medically appropriate" for home detention.  *Id*.  This was described as the decision of the "Regional Medical Director," "Regional Manager," and Sonja Wilson herself.  *Id*.  According to the note, Green could return to CHDU once he was "tapered off of narcotics and monitored for narcotic [withdrawal] and provided a

stable effective non-narcotic pain management regimen post surgical procedure." ECF 56-6 at 26. Ultimately, Green was released from CMCF on December 15, 2015, through the application of diminution credits, to begin a period of mandatory supervision. ECF 56-7 ("Mandatory Supervision Release Certificate" and related documents).

Green testified that following the removal of the stimulator, he has experienced an increase in the chronic pain that the stimulator had been implanted to address. ECF 56-1 at 7-8 (Tr. at 28-29). The stimulator was not replaced. Although Green expressed a desire to do so, he stated that the procedure would not be covered by Medicaid, so he would have to pay for it with his own funds. *Id*. at 6, 8-9 (Tr. at 27, 29-30). Therefore, he has been addressing his pain with medication. *Id*. at 7 (Tr. at 28).

### C.  Wilcox, Simon, and Wilson Reports

Defendants have submitted two expert reports: one by Todd R. Wilcox, M.D., and another by Gary Simon, M.D. *See* ECF 56-8 (Defendants' Rule 26(a)(2) Expert Disclosure); ECF 56-9 ("Wilcox Report"); ECF 56-10 ("Simon Report"). Plaintiffs have submitted what they describe as an expert report, prepared by Kenneth L. Wilson, M.D. *See* ECF 59-1 ("Wilson Report"). As discussed below, defendants vigorously contest that Dr. Wilson has been properly disclosed as an expert, and the admissibility of his report.

The Wilcox Report is dated December 18, 2018. ECF 56-9 at 4.[10] Dr. Wilcox is a licensed physician who practices in the field of correctional health care. *Id*. at 1. As of the date of his report, he was the Medical Director of the Salt Lake County Jail System and the President of the American College of Correctional Physicians. *Id*. He is board certified by the American Board of

---

[10] A "Certificate of Qualified Expert" included with the Wilcox Report is dated December 19, 2018. ECF 56-9 at 2.

Urgent Care Medicine, and holds advanced levels of certification in correctional health care from the National Commission on Correctional Health Care.  ECF 56-9 at 1.  Dr. Wilcox has over 20 years of experience in the design, administration, and delivery of correctional health care, and in the standards governing the field.  *Id*.

According to the Wilcox Report, a "hardware failure" of a peripheral nerve stimulator, such as what occurred in Green's case, is a "common occurrence."  *Id*. at 6.  Dr. Wilcox reviewed the timeline and stated that, once the problem presented itself, Green "was seen in physician sick call in a timely fashion, his condition was evaluated and the treatment plan that was created conformed to the standard of care."  *Id*.  In addition, he opined that consults here were written, approved, and scheduled in a timely fashion.  *Id*.  Moreover, Dr. Wilcox said: "During the time interval between the presentation of the problem and the surgical removal of the peripheral nerve stimulator, the patient's diagnostic testing demonstrated that his problem was localized and never became a threat to him systemically. . . . As such, from a medical perspective, his infection was localized and not serious."  *Id*.  Therefore, in his view, oral antibiotics and wound care were appropriate to manage the situation "until definitive care could be scheduled."  *Id*.

Furthermore, the Wilcox Report states that Green "was seen in a timely fashion with respect to the consultation with the neurosurgeon," and the surgery was "timed appropriately with the completion of the preoperative antibiotic course . . . ."  *Id*. at 7.  In his view, it was reasonable for facility physicians to follow the recommendations of the specialist, *i.e.*, Dr. Park.  *Id*.  And, Green had an "uneventful recovery from his procedure and was sent back to general population without any issues."  *Id*.

In his report, Dr. Wilcox concluded, *id*.: "[Green's] overall care was medically reasonable and completed in a timely fashion.  His care for this problem conformed to the standard of care. . . .

14

No act or omission on the part of Wexford, or its agents, servants, and employees, proximately caused any injuries claimed by Mr. Green in this matter."

Defendants' second expert, Dr. Simon, is a licensed physician who states that he has more than 40 years of experience as an infectious disease specialist. ECF 56-10 at 1. He is a "Diplomate of the American Board of Internal Medicine and subspecialty Board in Infectious Diseases." *Id*. The Simon Report is dated June 2, 2021. *Id*. In his report, Dr. Simon concluded, *id*. at 3:

> In my opinion to a reasonable degree of medical probability, Green developed a localized infection secondary to the fact that he had a foreign body in situ. Green's infection was chronic in nature. At no time did Green's localized infection develop into a systemic infection. Green received appropriate evaluation and medication management for his chronic infection.

> In my opinion to a reasonable degree of medical probability, Green's localized infection was minor and Green was a candidate for surgical removal of his neurotransmitter after completion of his courses of oral antibiotics. However, it was within the clinical judgment of the neurosurgeon to delay surgical removal of the device to allow placement of a PICC line and administration of a course of IV antibiotics.

> Following, [sic] removal of his neurotransmitter Green's leg healed appropriately and his local infection resolved.

Plaintiff's asserted expert, Dr. Wilson, is an "Associate Professor, Trauma and Acute Care Surgery" and "Deputy Director, Trauma Center" at "The University of Chicago Medicine & Biologic Sciences." ECF 59-1 at 5.[11] The Wilson Report is dated May 9, 2018. *Id*. Unlike Dr. Wilcox, Dr. Wilson concluded that the standard of care was not met with respect to Green's medical care. *Id*. at 2, 4. In Dr. Wilson's view, Green's encounters with his health care practitioners "did not adequately address the seriousness of his medical situation," *id*. at 4, and Green's "hardware infection exposed [him] to considerable risk." *Id*. at 2.

---

[11] This information is drawn from the titles that appear in the Wilson Report; no biographical information is included in the report.

Specifically, Dr. Wilson found that Dr. Rizvi's initial care of Green on July 22, 2015, and subsequent recommendations, were within the standard of care.  ECF 59-1 at 3.  But, in his view, the treatment by Dr. Onabajo on August 31, 2015, and by Dr. Rizvi on September 25, 2015, violated the standard of care.  *Id.*  He explained: "The ulceration and drainage of pus from the affected limb denotes a nidus of infection that should have led to a prompt surgical consultation." *Id.* at 4.  But, "[n]o surgical consultation was obtained, and antibiotic therapy was given alone." *Id.*  He added that Green was "returned to his cell and forced to suffer with rigors," and "obvious signs of an overwhelming bacterial infection should not have been ignored."  *Id.*  Moreover, he opines that the health care practitioners "failed to recognize and treat the signs of impending sepsis from a bacterial infection despite high fevers, drainage of pus, diaphoresis and rigors."  *Id.*  And, although the surgery was "successful and mitigated [Green's] suffering," Dr. Wilson contends that "it occurred in an untimely manner after three months of an infected implant."  *Id.*

Defendants assert a number of deficiencies with the Wilson Report, including "incorrect factual assumptions that have been conclusively proven wrong through the course of discovery." ECF 60 at 7; *see id.* at 6-8.  For example, the Wilson Report states, ECF 59-1 at 3, 4: "The record is unclear as to whether or not the CT scan of the leg was performed. . . . A CT scan of the leg was requested at a later date by Muleta T. Obsu, M.D., but was not completed."  But, it appears to be undisputed that Green had a CT scan on September 17, 2015.  *See* ECF 56-6 at 52-53.

Additional facts are discussed, *infra*.

## II.    Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc*., 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp*., 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.; *see CTB, Inc. v. Hog Slat, Inc*., 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc*., 888 F.3d at 659; *Sharif v. United Airlines, Inc*., 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252; *see McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Pursuant to Fed. R. Civ. P. 56(c)(1), where the moving party bears the burden of proof on the issue at trial, he must support his factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials . . . ." But, where the nonmovant bears the burden of proof at trial, the moving party may show that it is entitled to summary judgment by citing to evidence in the record, or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp*., 477 U.S. at 325; *see also* Fed. R. Civ. P. 56(c)(1)(B).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co*., 475 U.S. at 587; accord *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc*., 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).  But, the nonmovant "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)

(internal quotation marks omitted).   Rather, "there must be evidence on which the jury could reasonably find for the nonmovant."   *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (alteration and internal quotation marks omitted).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249; accord *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).   Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.   *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"   *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)).   But, if testimony is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving.   *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 Fed. App'x 209, 212 (4th Cir. 2017).   Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'"   *Cowgill v. First Data Technologies, Inc.*, ___ F. 4th ___, 2022 WL 2901043, at *9 (4th Cir. July 22, 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

19

On the other hand, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *see also, e.g.*, *Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co*., 499 Fed. App'x 285, 294 (4th Cir. 2012). "[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial. Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997).

## B. Choice of Law

All of plaintiffs' claims are state law tort claims, with the exception of Count VI, the deliberate indifference claim. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd*., 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland is the forum state.

The parties assume, without discussion, that Maryland law applies here. In tort actions, Maryland adheres to the rule of *lex loci delicti*, meaning it applies the substantive law of the state where the wrong occurred. *Ben-Joseph v. Mt. Airy Auto Transporters, LLC*, 529 F. Supp. 2d 604, 606 (D. Md. 2008) (citing *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 619, 925 A.2d 636, 648-49 (2007)) (other citations omitted); *see also DiFederico v. Marriott Int'l, Inc.*, 677 Fed. App'x 830, 833 (4th Cir. 2017).

It is undisputed that any asserted wrongs occurred in Maryland, where plaintiff was incarcerated.  Accordingly, I shall apply Maryland law as to the state law claims.

### III.   Discussion

### A.  Disclosure of Dr. Wilson

The parties vigorously dispute the admissibility of the Wilson Report and plaintiffs' proposed use of Dr. Wilson as an expert.  As discussed, *infra*, in the context of this case, plaintiffs require an expert witness to avoid summary judgment in defendants' favor.

Defendants argue that plaintiffs have never disclosed Dr. Wilson, nor any other expert witness, in compliance with Fed. R. Civ. P. 26(a)(2).  Therefore, defendants contend that any expert testimony by Dr. Wilson must be excluded, and his report must be disregarded, pursuant to Fed. R. Civ. P. 37(c)(1).  ECF 56-1 at 13-14; ECF 60 at 1-9.  Plaintiffs maintain that they adequately disclosed Dr. Wilson and therefore he may serve as their expert.  ECF 59 at 1-2, 4-5.

### 1.  Rule 26 Analysis

It is clear from the record that plaintiffs did not comply with the expert disclosure requirements contained in Fed. R. Civ. P. 26(a)(2).  As relevant here, this rule provides:

 (2) *Disclosure of Expert Testimony.*

   (A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

   (B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

      (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

      (ii) the facts or data considered by the witness in forming them;

      (iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

\*     \*     \*

*(D) Time to Disclose Expert Testimony.* A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(i) at least 90 days before the date set for trial or for the case to be ready for trial; or

(ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.[12]

"The purpose of Rule 26(a) is to allow litigants 'to adequately prepare their cases for trial and to avoid unfair surprise.'" *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 190 (4th Cir. 2017) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014)).  And, "Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005).

As noted, expert disclosures under Rule 26(a)(2) must generally be made as ordered by the Court, or else at least 90 days before the start of trial.  Fed. R. Civ. P. 26(a)(2)(D).  In this case, the Court issued a Scheduling Order on February 24, 2021, requiring plaintiffs to provide their expert disclosures under Rule 26(a)(2) by May 12, 2021.  ECF 42 at 1.  Defendants' Rule 26(a)(2) were due by July 12, 2021.  *Id*.  And, plaintiffs' rebuttal Rule 26(a)(2) disclosures were due by July 26, 2021.  *Id*.  Notably, the Scheduling Order followed a telephone conference that the Court

---

[12] Fed. R. Civ. P. 26(a)(2)(C) imposes modified disclosure requirements for certain types of expert witnesses who are not required to provide a written report. I have omitted this section, as there is no dispute that Dr. Wilson falls within Fed. R. Civ. P. 26(a)(2)(B).

held with counsel on February 23, 2021, at which the Court discussed the proposed schedule.  *See*

Docket.

In addition, the parties had previously engaged in discovery while the case was in State

court, prior to removal to this Court on July 15, 2019.  *See* ECF 1 (Notice of Removal); *see also*

ECF 1-10; ECF 1-18; ECF 1-25; ECF 1-26; ECF 1-27 (Notices of Service of Discovery in State

court).  Maryland Rule 2-402(g)(1)(A) provides:

> A party by interrogatories may require any other party to identify each person, other
> than a party, whom the other party expects to call as an expert witness at trial; to
> state the subject matter on which the expert is expected to testify; to state the
> substance of the findings and the opinions to which the expert is expected to testify
> and a summary of the grounds for each opinion; and to produce any written report
> made by the expert concerning those findings and opinions. A party also may take
> the deposition of the expert.

The Circuit Court for Howard County had issued a Scheduling Order (ECF 1-16), which

was modified on February 24, 2019, by consent of the parties.  *See* ECF 1-23 (Modified Scheduling

Order).  According to the Modified Scheduling Order, the deadline for plaintiff's designation of

experts was September 3, 2019.  *Id.*  In interrogatories propounded by Wexford to Green while the

case was in State court, Wexford asked plaintiff to identify all experts he proposed to call as

witnesses at trial, and to provide information about them.  ECF 60-1 (Pl. Green's Answers to Def.

Wexford's Interrogs.) at 2.  In his answers, dated May 24, 2019, Green stated only, *id.*: "Plaintiff

Green will designate experts in accordance with the governing Scheduling Order.  Plaintiff

reserves the right to supplement this Answer."

Defendants timely made their Rule 26(a)(2) disclosures on July 9, 2021.  *See* ECF 56-8.

But, the Motion asserts, ECF 56-1 at 8, 13: "Green and Munir did not serve expert disclosures in

this case. . . . Plaintiffs do not have an expert witness.  Their expert disclosure deadline was May

12, 2021.  Plaintiffs have never produced an expert disclosure, including when this case was

pending in State court before removal."  And, the Reply states, ECF 60 at 2-3: "Plaintiffs never served an expert disclosure.  After the Defendants timely served their expert disclosure, Plaintiffs never sought to file a late expert disclosure, nor did they file a rebuttal expert disclosure by the scheduling order's deadline of July 26, 2021."

In response, plaintiffs have not provided any explicit expert disclosures or designations, whether in this Court or while the case was pending in State court.  But, they assert, ECF 59 at 2: "Plaintiffs produced Dr. Wilson's expert report to the Defendants in discovery on June 10, 2019, while this action was pending in state court."  *See also id.* at 4 ("Plaintiffs produced their expert's written, signed report to the Defendants in June 2019 while this action was pending in state court.").  The only citation plaintiffs provide for this claim is to the Wilson Report itself, which does not clarify the context in which it was provided in discovery.  However, considering the various assertions by both sides in the briefing, as well as the cited documents, it appears that plaintiffs produced the Wilson Report, which they now seek to label as an expert report, during discovery in State court, but never designated Dr. Wilson as their expert.[13]

Plaintiffs also maintain, in a footnote, that they "previously produced their expert's report as an attachment to the initial Complaint" that they filed in the Circuit Court for Baltimore County. ECF 59 at 4 n.2; *see* ECF 3 (the Complaint).  I note that no such attachment appears in the version of the Complaint that was docketed with this Court upon removal.  *See* ECF 1-2; ECF 3.  Nor does the text of the Complaint reference any such attachment.  However, the lack of an attachment may

---

[13] Several discovery notices were docketed in the State court case. *See* ECF 1-10; ECF 1-18; ECF 1-25; ECF 1-26; ECF 1-27; *see also Green v. Wexford Health Sources, Inc.*, No. C-13-CV-18-000929 (Howard Cty. Cir. Ct.). But, there is no Notice of Service of Discovery dated June 10, 2019. However, there is a Notice of Service of Discovery dated June 13, 2019, which indicates that plaintiffs had responded to Wexford's requests for the production of documents.

be due to the manner in which the Complaint was docketed in this Court, rather than an indication that it lacked such an attachment when originally filed.

Maryland's Health Care Malpractice Claims Act ("HCMCA"), Md. Code (2020 Repl. Vol., 2021 Supp.), § 3-2A-01 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), "creates a mandatory arbitration system for all medical malpractice claims alleging damages over a certain limit in order to weed out non-meritorious claims and reduce the costs of litigation." *Wilcox v. Orellano*, 443 Md. 177, 184, 115 A.3d 625 (2015). Under the HCMCA, a plaintiff must "file a certificate of a qualified expert with the Director [of the Health Care Alternative Dispute Resolution Office ("HCADRO")] attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury, within 90 days from the date of the complaint," together "with a report of the attesting expert." C.J. § 3-2A-04(b)(1), (3).

In the Reply, defendants assert that the Wilson Report, which plaintiffs now attempt to present as an expert report under Rule 26(a)(2), was originally filed with the HCADRO, pursuant to the HCMCA. ECF 60 at 3. And, they maintain that the expert report required by the HCMCA serves a fundamentally different function than the expert disclosure required by Rule 26(a)(2), such that the former is not a substitute for the latter. *Id*. at 3-4. It seems plausible that the Wilson Report was originally developed for HCMCA purposes. However, neither the Wilson Report itself, nor the Opposition, explicitly indicate this usage.

In any case, plaintiffs essentially argue that the production of the Wilson Report during discovery is the equivalent of the expert disclosure contemplated by Rule 26(a)(2). The Opposition states, ECF 59 at 4: "Plaintiffs' expert report contains all of the information required by Rule 26(a)(2)(B).[ ]" I disagree.

As an initial matter, there is nothing in the Wilson Report indicating that Dr. Wilson would be called to testify in the case.  Nor does the Wilson Report contain all of the information required by Rule 26(a)(2)(B).  It contains, or could be construed to contain, the information required by Fed. R. Civ. P. 26(a)(2)(B)(i), (ii), and (iii): a statement of Dr. Wilson's opinions; the facts or data considered in forming them; and any exhibits that will be used to support them.  But, it contains no information, apart from Dr. Wilson's title, as to Dr. Wilson's qualifications or publications; any cases in which he has testified as an expert; or his compensation.  Although Fed. R. Civ. P. 26(a)(2)(B)(iv), (v), and (vi) requires such information, it is entirely absent from the Wilson Report.[14]  *Compare with* ECF 56-8 (Defendants' Rule 26(a)(2) Expert Disclosure).

In sum, it appears that the Wilson Report document was previously made available to defendants, whether in State court discovery or with the original Complaint.  But, there is absolutely no indication that plaintiffs provided an expert disclosure for Dr. Wilson consistent with Rule 26(a)(2), either by the deadline specified in this Court's Scheduling Order or at any other time.  And, the Wilson Report lacks a substantial amount of the information required to be disclosed under Rule 26(a)(2)(B).

## 2.  Scheduling Order

To begin, plaintiffs were obligated to provide any expert disclosure in accordance with the terms of the Scheduling Order, *i.e.*, by May 12, 2021.  *See* ECF 42.  The importance of a scheduling order cannot be disregarded.

A scheduling order, such as the Scheduling Order in this case, is not a "'frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'"  *Potomac*

---

[14] In a footnote in the Opposition, plaintiffs state, ECF 59 at 4 n.3: "Dr. Wilson has never been identified or testified as an expert witness before, so he does not have a list of prior cases in which he has testified." This may be true, but it appears nowhere in the Wilson Report.

*Electric Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 375-76 (D. Md. 1999) (quoting *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)).   To the contrary, scheduling orders serve a vital purpose in helping a court manage its civil caseload.  *Gestetner Corp.*, 108 F.R.D. at 141; *see also Naughton v. Bankier*, 14 Md. App. 641, 653, 691 A.2d 712, 718 (1997) (recognizing that a scheduling order helps "to maximize judicial efficiency and minimize judicial inefficiency").  "In an era of burgeoning case loads and [crowded] dockets, effective case management has become an essential tool for handling civil litigation."  *Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 45 (1st Cir. 2002) (alteration added). To that end, a scheduling order is an important vehicle in "'securing the just, speedy, and inexpensive determination of every action.'"  *Miller v. Transcend Services, Inc.*, 10 CV 362, 2013 WL 1632335, at *4 (M.D.N.C. Apr. 16, 2013) (citation omitted).

The importance of a scheduling order is reflected in the fact that good cause is required to modify a scheduling order.  *See* Fed. R. Civ. P. 16(b)(4).  The "'touchstone'" of Rule 16(b)(4)'s "good cause requirement is 'diligence.'"  *Faulconer v. Centra Health*, 808 Fed. App'x 148, 152 (4th Cir. 2020) (citation omitted).  Indeed, "only diligent efforts to comply with the scheduling order can satisfy Rule 16's good cause standard."  *Id*. at 152.  The Fourth Circuit has endorsed this proposition several times, in line with other circuits.  *Id*. at 152 n.1 (collecting cases).  Accord *Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) ("Lack of diligence and carelessness are 'hallmarks of failure to meet the good cause standard.'") (citation omitted).  Any such diligence is absent here.

### 3.   Rule 37 Analysis

Plaintiffs plainly failed to disclose Dr. Wilson as an expert witness in accordance with Rule 26(a)(2).  The penalty for failure to disclose under Rule 26(a)(2) is exclusion, unless the

nondisclosure was substantially justified or harmless under Fed. R. Civ. P. 37(c)(1).  *See Bresler*, 855 F.3d at 190; *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (2003).  Rule 37(c)(1) provides, in relevant part: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Substantial case law has developed regarding the application of Rule 37(c)(1), although the parties cite to none of it.  "[T]he basic purpose of Rule 37(c)(1)" is "preventing surprise and prejudice to the opposing party."  *Southern States*, 318 F.3d at 596.  The Fourth Circuit has emphasized that Rule 37(c)(1) imposes an "'automatic sanction' of exclusion," and that the "general rule" is that evidence a party has "failed to properly disclose" should be excluded.  *Id*. at 595 n.2, 596 (quoting 1993 Advisory Committee Note to Fed. R. Civ. P. 37).  This is because "[a] party that fails to provide [Rule 26] disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case."  *Saudi*, 427 F.3d at 278-79.

As the Fourth Circuit stated in *Carr v. Deeds*, 453 F.3d 593, 605 (2006), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010):

> Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client. . . . The available penalty for failure to comply with Rule 26(a)(2)(B) is equally plain, and if a litigant refuses to comply with the requirements of the rule, he does so at his peril.

"The only exceptions to exclusion [under Rule 37(c)(1)] are when the nondisclosure is substantially justified or harmless."  *Contech Stormwater Solutions, Inc. v. Baysaver Technologies, Inc.*, 534 F. Supp. 2d 616, 623 (D. Md. 2008).  "The party failing to disclose information bears the

burden of establishing that the nondisclosure was substantially justified or was harmless." *Bresler*, 855 F.3d at 190.

"District courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Id*. (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)). "[I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Southern States*, 318 F.3d at 597.

"The first four factors listed above relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190. But, a district court is "not *required* to tick through each of the *Southern States* factors." *Wilkins*, 751 F.3d at 222 (emphasis in original); accord *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 330 (4th Cir. 2011). Moreover, "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the discovery rules." *Southern States*, 318 F.3d at 596.

*Carr*, 453 F.3d at 601-05, is particularly instructive if not strikingly similar. In *Carr*, the plaintiff brought a § 1983 claim against the State of West Virginia, the Superintendent of the West Virginia State Police, and two State Police troopers, alleging (among other claims) that the two troopers had unconstitutionally employed deadly force during an attempted arrest of her son, resulting in his death. *Id*. at 596. In particular, the plaintiff contended that the two troopers

"tracked [her son] down in the woods, disarmed or incapacitated [him], and then placed their pistols against [his] head and executed him." *Id*. at 601.  However, "the only evidence submitted in support of this allegation of an execution-style murder [was] contained in the reports of Dr. John Cooper," the plaintiff's purported expert. *Id*.  "In the reports, Dr. Cooper identifies himself as an Independent Medical Examiner with California Autopsy and Consultation in Fair Oaks, California, but there is no further information or elaboration regarding his credentials." *Id*. at 602.

The plaintiff filed her complaint in June 2003, "attaching the initial and supplemental reports of Dr. Cooper." *Id*. at 602.  Thus, there was no dispute that plaintiff provided the documents that she sought to introduce as expert reports.

In September 2003, the district court entered a scheduling order, requiring the plaintiff to make her expert disclosures by February 1, 2004, and setting a discovery deadline of June 1, 2004. *Id*. at 602.  However, plaintiff "did not serve a Rule 26(a)(2)(B) disclosure for Dr. Cooper by the February 1 deadline, and in fact never filed the requisite disclosure." *Id*.  A deposition was scheduled for Dr. Cooper, but defense counsel advised plaintiff's counsel that the disclosure regarding Dr. Cooper was inadequate to prepare for the deposition. *Id*. at 602-03.  Nevertheless, "plaintiff's counsel made no belated effort to obtain the requisite information or serve a disclosure for Dr. Cooper." *Id*. at 603.  Instead, plaintiff's counsel referred defense counsel to the reports submitted with the complaint, and pointed to asserted deficiencies with the defendants' own expert disclosure. *Id*.

The plaintiff's lawyer never served any disclosure by the time discovery closed, and Dr. Cooper was never deposed. *Id*.  Accordingly, defendants moved to exclude Dr. Cooper under Rule 37(c)(1), and for summary judgment. *Id*.  The district court granted the Rule 37(c)(1) motion and,

because there was no admissible evidence supporting plaintiff's claim, entered summary judgment for defendants.  *Id*.

On appeal, the Fourth Circuit upheld the district court's Rule 37 decision.  *Id*. at 603-05. The plaintiff argued "that her failure to comply with the rule was either 'surely inadvertent' or justified by her belief that defendants had failed to comply with their obligations under the rule . . . ."  *Id*. at 603.  The Fourth Circuit disagreed.  The court noted that "plaintiff has not demonstrated that her failure was inadvertent," as she had "provided no explanation for her initial failure to file the disclosure."  *Id*. at 604.  And, "litigants are not excused from their obligations under the rules of procedure merely because an opponent has failed to comply with his obligations."  *Id*.

Of significance here, the plaintiff in *Carr* also contended that "her failure was harmless because Dr. Cooper's opinions were attached to the complaint."  *Id*. at 603.  But, the Fourth Circuit emphatically rejected this argument.  The court emphasized that Dr. Cooper's reports provided "absolutely no information about his qualifications, any publications authored by him, the compensation he would be paid for his work and testimony, or other cases in which he had testified as an expert."  *Id*. at 604.  The Court remarked, *id*.: "[W]e have previously recognized the critical importance of this type of information, particularly in cases which turn upon expert testimony . . . [A]s a consequence of plaintiff's failure to provide the information plainly required by the rule, defendants were not permitted to investigate Dr. Cooper's licensure, training, background, or expertise, nor were they in a position to determine whether Dr. Cooper possessed the requisite qualifications to render the rather broad range of opinions contained in his reports."

The Fourth Circuit concluded, *id*. at 605: "To be sure, plaintiff's allegations in this case are most serious, but they are equally serious for *both* sides of this controversy. The district court

afforded plaintiff a full and sufficient time to discover and produce evidence to substantiate her allegations by proper and admissible evidentiary support, but plaintiff failed to do so." (Emphasis in original.)  Having affirmed the district court's Rule 37 decision, the Fourth Circuit upheld the summary judgment ruling.  *Id*.

Considering these principles and the case law, I readily conclude that Dr. Wilson, and the Wilson Report, are subject to exclusion under Rule 37(c)(1).  At the outset, I emphasize that plaintiffs' failure to comply with their Rule 26(a)(2) disclosure requirements is particularly blatant. The requirements imposed by Rule 26(a)(2) are not complicated.  Moreover, the Scheduling Order (ECF 72) established a deadline of May 12, 2021, for plaintiffs to make their Rule 26(a)(2) expert disclosures.  *See* ECF 42 at 1.  Plaintiffs, who have been represented by counsel throughout this litigation, did not do so.  Nor did they subsequently seek to file a belated Rule 26 disclosure, even after receiving defendants' timely Rule 26 expert disclosure (*see* ECF 56-8), or after this issue was raised in the Motion.

Plaintiffs offer minimal explanation for their failure to disclose, as required.  *See* ECF 59 at 4-5 (addressing this issue).  At most, they appear to assert that it was unnecessary for them to file their Rule 26(a)(2) disclosure, as required by the Scheduling Order, because they had previously produced the Wilson Report in State court discovery approximately two years earlier. *See id*. at 2, 4-5.  Thus, they contend that there is no real surprise to defendants regarding Dr. Wilson and his report.  *Id.* at 4-5.  But, producing the report is not equivalent to filing a Rule 26(a)(2) disclosure.  As discussed, the Wilson Report omits key information required by Rule 26(a)(2)(B).  And, the surprise to defendants derives not simply from the content of the Wilson Report, but from the fact that plaintiffs would seek to use Dr. Wilson as their expert witness, and his report as their expert witness report.

As indicated, the Fourth Circuit squarely addressed this issue in *Carr*, 453 F.3d at 604, rejecting the plaintiff's argument in that case that her failure to file her Rule 26 expert disclosures was harmless because she had previously provided the defense with the text of the purported expert reports.   The Fourth Circuit noted that the reports, as furnished, contained "absolutely no information about [the expert's] qualifications, any publications authored by him, the compensation he would be paid for his work and testimony, or other cases in which he had testified as an expert," and such information was of "critical importance . . . to determine whether Dr. Cooper possessed the requisite qualifications."   *Id.*   The categories of information missing from Dr. Cooper's reports in *Carr* are precisely the same as those missing from the Wilson Report. Indeed, defendants argue that because Dr. Wilson "is a surgeon who teaches in the field of trauma and acute care surgery, [he] is not qualified to testify as a standard of care expert in a medical malpractice claim brought under Maryland law against primary care practitioners who provide care in a correctional health setting."   ECF 60 at 6.   The information missing from the Wilson Report presumably would have been vital in enabling defendants to fully evaluate this issue.

To be sure, the production of the Wilson Report raised the possibility that plaintiffs might seek to use Dr. Wilson as their expert.   But, defendants could hardly have been expected to assume that Dr. Wilson would be plaintiffs' expert, in the absence of any Rule 26(a)(2) disclosure.   It is not uncommon for a party to rely on one expert for the HCADRO and another for trial.   Once the disclosure deadline of May 12, 2021, passed without any Rule 26 disclosure from plaintiffs, as to Dr. Wilson or anyone else, it was reasonable for defendants to assume that Dr. Wilson would *not* be plaintiffs' expert, and to adjust their litigation strategy accordingly.   For example, they had no reason to depose Dr. Wilson, given the lack of an expert designation.   Moreover, as noted, the

Wilson Report lacked important information that is required in an expert disclosure under Rule 26(a)(2)(B), making any such information a surprise. *See Carr*, 453 F.3d at 604.

Plaintiffs assert that "undersigned counsel has also had multiple conversations concerning Plaintiffs' expert with counsel for the Defendants." ECF 59 at 4. However, they offer only a single example: an email from plaintiffs' counsel to defense counsel, dated July 8, 2019. *See* ECF 59-3 (the email); ECF 60-3 (the preceding email chain). On July 2, 2019, defense counsel emailed plaintiffs' counsel regarding a number of discovery issues. ECF 60-3 at 1-2. As part of this email, counsel sought an update on the status of certain discovery requests, including "Plaintiffs' itemization and supporting documents for damages for claimed medical expenses, past and future lost wages and household replacement services." *Id*. at 1. Plaintiffs' counsel responded on July 8, 2019, in an email that also addressed multiple discovery issues. As part of this email, counsel wrote, ECF 59-3 at 2: "Mr. Green's past medical expenses are listed in your Exhibit 2 (Bates No. 00206-00223). We will provide you with future costs after our expert evaluates Mr. Green again. We are just waiting for Dr. Wilson to return from a tour of duty in Afghanistan." To cite to this single reference to Dr. Wilson in an email, nearly two years before plaintiffs' Rule 26(a)(2) disclosure deadline, as notice that Dr. Wilson would testify as plaintiffs' expert witness, or as adequate to ameliorate any surprise to defendants, borders on the absurd.

The Opposition also notes that the Wilcox Report identifies the Wilson Report as one of the documents relied upon by Dr. Wilcox in preparing his report. *See* ECF 56-9 at 4-5. But, again, the fact that Dr. Wilcox was aware of the Wilson Report in 2018, when Dr. Wilcox prepared his report, hardly translates to the required disclosure.

Plaintiffs also appear to fault defendants for not conducting further discovery regarding Dr. Wilson. *See* ECF 59 at 4. But, the whole point of Rule 26(a)(2) is that a litigant is entitled to rely

on the opposing party's expert disclosure, without the need to conduct unnecessary discovery. "Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client." *Carr*, 453 F.3d at 605.

It is also clear that defendants have been prejudiced by plaintiffs' nondisclosure, even considering that they had already been provided with the Wilson Report. As defendants note (ECF 60 at 8-9), it was reasonable for them to decline to depose Dr. Wilson while they were under the impression that he would not be plaintiffs' expert witness. But, if Dr. Wilson had been disclosed as an expert, defendants' calculus surely would have changed. It is common practice to depose experts in medical malpractice cases. In this case, Dr. Wilson's opinions are of crucial importance. And, as noted, defendants assert a number of problems with the Wilson Report and with Dr. Wilson's qualifications. *See id*. at 6-8. Given defendants' issues with Dr. Wilson, it is quite likely that they would have deposed Dr. Wilson if he had been designated as an expert witness. Plaintiffs' failure to disclose Dr. Wilson as an expert effectively denied defendants the ability to depose him, at least in any context in which defendants knew Dr. Wilson was plaintiffs' expert. And, without such a deposition, defendants' ability to prepare for summary judgment and for trial has been materially harmed.

Declining to exclude Dr. Wilson would not necessarily disrupt the trial itself, which has not yet been scheduled. But, any attempt to cure the dereliction would certainly cause disruption, and would further extend the length of this litigation. If the Court were to permit plaintiffs belatedly to designate Dr. Wilson as their expert, they would first need to prepare and serve appropriate disclosures under Rule 26(a)(2)(B). As discussed, defendants would likely seek to

depose Dr. Wilson, which would require further time.  Defendants might also seek to update their own expert disclosures in light of the disclosure of Dr. Wilson.  Moreover, once all of this had been completed, defendants might reasonably seek a second opportunity to move for summary judgment based on the full record, with the attendant delays for briefing and time required for the Court to rule.  And, this case was removed to this Court more than three years ago, after having spent nearly a year in State court.  All parties, as well as the Court, have an interest in the efficient resolution of the case.  *See Carr*, 453 F.3d at 605 ("To be sure, plaintiff's allegations in this case are most serious, but they are equally serious for *both* sides of this controversy.") (Emphasis added).

The material that would be presented by Dr. Wilson is of substantial importance in this case, to both plaintiffs and defendants.  I am mindful that, without an expert witness, it is significantly more difficult for plaintiffs to create a genuine dispute of material fact as to their claims, as discussed below.  But, the exclusion of Dr. Wilson as an expert witness, and the exclusion of the Wilson Report, are appropriate in light of plaintiffs' failure to adhere to their Rule 26 disclosure requirements; the principles of Rule 37(c)(1); plaintiffs' failure to offer any real explanation for noncompliance; and the surprise and prejudice to defendants as a result of the nondisclosure.

I turn to the merits of plaintiffs' claims.

## B.  Merits

To review, the SAC lodges negligence claims against Dr. Obsu, Dr. Onabajo, and Dr. Rizvi (Counts I, II, and III), as well as a "Respondeat Superior" claim against Wexford premised on the alleged negligence of the doctors (Count IV).  ECF 28, ¶¶ 74-87.  Plaintiffs also bring a claim for loss of consortium against all defendants (Count V).  *Id.* ¶¶ 88-89.  Finally, the SAC alleges

deliberate indifference on the part of the individual defendants, in violation of the Eighth and Fourteenth Amendments (Count VI).  ECF 28, ¶¶ 90-100.[15]

In sum, plaintiffs complain that Green had been in pain for several months by the time he saw Dr. Rizvi on July 22, 2015.  ECF 59 at 3.[16]  Moreover, they assert that although Dr. Rizvi submitted an "urgent" request for a surgical evaluation, that consultation did not occur until October 30, 2015.  *Id.*  And, plaintiffs complain that by that time, Green had an "acute infection" that required IV antibiotics.  *Id.*  Yet, they point out that it "took an additional five days for the Defendants to administer" the antibiotics.  *Id.*  Plaintiffs also complain that surgery did not occur until November 18, 2015, some five months after Dr. Rizvi's "urgent" evaluation request.  *Id.*

### 1.  Negligence Claims (Counts I, II, and III)

### i.

The Maryland Court of Appeals has said: "The traditional [medical malpractice] action has been for negligence in the performance (or non-performance) of a course of therapy or a medical procedure."  *Dingle v. Belin*, 358 Md. 354, 368, 749 A.2d 157, 164 (2000).  In Maryland, a "*prima facie* case of medical malpractice must consist of evidence which (1) establishes the applicable standard of care, (2) demonstrates that this standard has been violated, and (3) develops a causal relationship between the violation and the harm complained of."  *Weimer v. Hetrick,* 309 Md. 536, 553, 525 A.2d 643, 651 (1987) (citation omitted); *see Dehn v. Edgecombe*, 384 Md. 606, 610, 865 A.2d 603, 618 (2005) ("Medical malpractice 'is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining

---

[15] This count was initially brought against Wexford as well as the individual defendants, but, as noted, Wexford has been dismissed from Count VI.  *See* ECF 46; ECF 47.

[16] The Court has not found any evidence in the record indicating that Green actively but unsuccessfully sought a doctor's appointment well before July 22, 2015.

liability.'") (quoting *Benson v. Mays,* 245 Md. 632, 636, 227 A.2d 220, 223 (1967)); *see also Univ. of Md. Med. Sys. Corp. v. Gholston,* 203 Md. App. 321, 330, 37 A.3d 1074, 1078 (2012) ("The elements of the tort [of medical malpractice] are duty (standard of care); breach of the standard of care; causation of injury; and damages.").

This standard applies in federal court. *Ford v. United States*, 165 F. Supp. 3d 400, 422-23 (D. Md. 2016) (stating that the elements of a medical malpractice claim include: "(1) the applicable standard of care; (2) that this standard has been breached; and (3) a causal relationship between the violation and the injury"); *see Lawson v. United States,* 454 F. Supp. 2d 373, 416 (D. Md. 2006) (same).   In a medical malpractice suit, if proof of any of the elements is lacking, "'the court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go [to] the jury.'"  *Rodriguez v. Clark*, 400 Md. 39, 71, 926 A.2d 736, 755 (2007) (quoting *Fink v. Steele,* 166 Md. 354, 361, 171 A. 49, 52 (1934)).

As a general rule, recovery for medical malpractice is allowed only "where there is a relationship between the doctor and patient."  *Dehn*, 384 Md. at 620, 865 A.2d at 611; *see Eid v. Duke,* 373 Md. 2, 16, 816 A.2d 844, 852 (2003); *Dingle,* 358 Md. at 367, 749 A.2d at 164; *Hoover v. Williamson,* 236 Md. 250, 253, 203 A.2d 861, 863 (1964).   Such a relationship "may be established by contract, express or implied, although creation of the relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship."  *Dehn*, 384 Md. at 620, 865 A.2d at 611.   Fundamentally, the relationship must be "a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established."  *Id.*

As to the standard of care, a physician must "'use that degree of care and skill which is

expected of a reasonably competent practitioner in the same class to which [the physician] belongs, acting in the same or similar circumstances.'" *Dingle*, 358 Md. at 368, 749 A.2d at 164 (quoting *Shilkret v. Annapolis Emergency Hosp.,* 276 Md. 187, 200, 349 A.2d 245, 252 (1975)) (alteration in *Dingle*) (internal footnote omitted); *see Upper Chesapeake Health Ctr., Inc. v. Gargiulo,* 223 Md. App. 772, 2015 WL 6112393, at *5 (June 22, 2015, Md. Ct. Spec. App.), *cert. denied,* 445 Md. 22, 123 A.3d 1007 (2015); *see also Ford*, 165 F. Supp. 3d at 423.  Put differently, the "care given or withheld" must be "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action." *Dingle*, 358 Md. at 368, 749 A.2d at 164 (citation omitted).  Moreover, "'advances in the profession, availability of facilities, specialization or general practice, proximity of specialists and special facilities, together with all other relevant considerations, are to be taken into account.'" *Ford*, 165 F. Supp. 3d at 423 (quoting *Shilkret,* 276 Md. at 200-01, 349 A.2d at 253).  And, a claim for medical malpractice "necessarily focuses on the manner in which the physician diagnosed and treated the patient's medical problem and . . . not so much on what was told to the patient or what the patient's expectations may have been." *Dingle*, 358 Md. at 368, 749 A.2d at 164; *see also Gargiulo*, 223 Md. App. 772, 2015 WL 6112393, at *5.

"Expert witnesses play a pivotal role in medical malpractice actions." *Rodriguez*, 400 Md. at 71, 926 A.2d at 755.  In a case alleging negligence by a professional, expert testimony is ordinarily required to establish the standard of care, breach of the standard of care, and causation. *Jones v. State of Maryland*, 425 Md. 1, 26, 38 A.3d 333, 347 (2012) (citations omitted).  The Maryland Court of Appeals has said: "The rule . . . is that experts are usually necessary to explain professional standards because such standards require specialized knowledge within the

professional's field that are generally 'beyond the ken of the average layman[.]'" *Id.*, 38 A.2d at 347-48 (citations omitted); *see Rodriguez*, 400 Md. at 71, 926 A.2d at 755 (stating that the court "has repeatedly recognized that 'expert testimony is required to establish negligence and causation.'") (quoting *Holzhauer v. Saks & Co.,* 346 Md. 328, 339, 697 A.2d 89, 94 (1997)); *Ford*, 165 F. Supp. 3d at 423 (stating that a medical malpractice "'defendant's use of suitable professional skill is generally a topic calling for expert testimony'") (quoting *Johns Hopkins Hosp. v. Genda,* 255 Md. 616, 623, 258 A.2d 595, 599 (1969)).  "If the plaintiff presents no expert when one is needed, then the trial court 'may rule . . . that there is not sufficient evidence to go [to] the jury.'"  *Jones*, 425 Md. at 26, 38 A.3d at 348 (citation omitted).

The case of *Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 408-09, 914 A.2d 113, 115 (2007), is instructive as to the testimony of an expert witness regarding causation.  There, the parents of a minor brought a medical malpractice claim, alleging that the minor's "autism spectrum disorder was caused by thimerosal, a mercury-containing preservative used in pediatric vaccines" administered to the minor when he was an infant.  *Id.* at 409, 914 A.2d at 115.  However, the plaintiffs were unable to produce expert testimony as to causation.  The defendants moved for summary judgment, arguing that the plaintiffs had failed to show any evidence as to causation.  *Id.* at 442, 914 A.2d at 135.  The circuit court granted the motion, noting that the plaintiffs had "conceded [their] inability to produce an expert witness on the area of specific causation[.]"  *Id.* at 409, 914 A.2d at 115.

The Maryland Court of Appeals affirmed.  *Id.* at 443, 914 A.2d at 136.  The court stated, *id.* at 441-42, 914 A.2d at 135:

> [T]here are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony.  Particularly is this true when . . . the cause of the injury relates to matters of common experience, knowledge, or observation of

laymen. . . .  However, where the cause of an injury claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls within the province of medical experts (especially when the symptoms of the injury are purely subjective in nature, or where disability does not develop until some time after the negligent act), proof of the cause must be made by such witnesses.

The court observed that the plaintiffs' medical malpractice suit "would require the trial court to determine whether vaccines administered to [the] eight-year-old [minor] as an infant caused his autism."  *Id.* at 442, 914 A.2d at 135.  It stated, *id.*: "For such a complex medical question, a medical expert would be necessary to prove specific causation within a reasonable degree of scientific certainty."  Therefore, the court concluded: "The trial court was correct in [its] legal conclusion that summary judgment was appropriate under the circumstances."  *Id.* at 443, 914 A.2d at 135.  *See also, e.g.*, *Galloway v. Horne Concrete Const.*, 524 Fed. App'x 865, 870-72 (4th Cir. 2012); *Wilhelm v. State Traffic Safety Commission*, 230 Md. 91, 99-05, 185 A.2d 715, 719-22 (1962); *S.B. Thomas, Inc. v. Thompson*, 114 Md. App. 357, 371-86, 689 A.2d 1301, 1308-15 (1997).

Conversely, an expert is not needed "when 'the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care.'" *Jones*, 425 Md. at 26, 38 A.3d at 348 (citation omitted).  In particular, "[i]f a jury can use its 'common knowledge or experience' to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant."  *Id.* at 27, 38 A.3d at 348 (citation omitted); *see Shultz v. Bank of Am., N.A.*, 413 Md. 15, 29, 990 A.2d 1078, 1086 (2010) ("[W]e have explained that sometimes the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony."); *Bean v. Dept. of Health & Mental Hygiene*, 406 Md. 419, 432, 959 A.2d 778, 786 (2008) ("[E]xpert medical opinion is required only 'when the subject of the inference [presented to the jury] is so particularly

related to some science or profession that it is beyond the ken of the average layman' and is not required 'on matters of which the jurors would be aware by virtue of common knowledge[.]'") (citations omitted) (some alterations in *Bean*); *Carter v. Shoppers Food Warehouse MD Corp*., 126 Md. App. 147, 158, 727 A.2d 958, 964 (1999) ("Expert testimony is not necessary when it relates to 'matters of which the jurors would be aware by virtue of common knowledge.'") (citation omitted); *see also Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md. App. 217, 257, 674 A.2d 106, 125-26 (1996) ("Expert testimony is not required . . . on matters of which the jurors would be aware by virtue of common knowledge."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

Similarly, under federal law, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702. However, expert testimony is inadmissible if it is directed towards matters "within the common knowledge of jurors." *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990); *see Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). In *Scinto v. Stansberry*, 841 F.3d at 230, the Court said: "When laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded." (Citation omitted).

The case of *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972), is instructive. In that case, while Faust Corso was standing next to his car on the side of a road, he was struck by a car traveling approximately "35 or 40 miles per hour", knocking Corso unconscious. *Id.* at 87-88, 288 A.2d 382. Corso vomited, bled from his mouth and head, and complained of pain in his right hip and numbness in his right thigh. *Id.* at 87-88, 288 A.2d at 382-83. Doctor Robert Thomas was

"on-call" that evening at the hospital emergency room where the plaintiff had been taken, and he received several calls from nurses as to their medical assessments of Corso. *Id.* at 88-91, 288 A.2d at 382-84. However, Dr. Thomas did not make the "10 minute[]" journey from his home to attend to Corso at the hospital. Instead, Corso was prescribed "100 milligrams of Demerol", a pain reliever, because he "appeared to be unsettled." *Id.* at 93, 288 A.2d at 385. Yet, Corso continued to complain to the nurses of pain in his right thigh. *Id.* at 90, 288 A.2d at 384. Several hours after arriving at the hospital, Corso experienced depressed blood pressure, had trouble breathing, and was pronounced dead shortly thereafter. *Id.*

The surviving spouse and children of Corso sued, *inter alia*, the doctor and the hospital, alleging malpractice. 265 Md. at 86, 97, 288 A.2d at 381-82, 387. The circuit court entered judgment in favor of the plaintiffs. *Id.*; 288 A.2d at 381-822. Before the Maryland Court of Appeals, the defendants argued that the trial court had erred because, *inter alia*, the plaintiffs had "failed to establish by expert evidence the standard of   care . . . and the violation of such a standard of care" by the defendants. *Id.* at 97, 288 A.2d at 387.

The Maryland Court of Appeals stated, *id.* at 97, 288 A.2d at 387: "Although in many medical malpractice cases expert testimony is required to be introduced by the plaintiff to establish the standard of care . . . it is well recognized by the Maryland cases that there may be cases in which no expert testimony is required to establish the standard of care or its breach by the physician." (Citations omitted). Further, the court said, *id.* at 98, 288 A.2d at 388: "'There is a limitation on the rule that expert testimony is essential to support a cause of action for malpractice where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.'" (Citation omitted). To illustrate, the court noted that expert testimony is not required in cases where a dentist removes "the wrong tooth", or when a surgeon amputates

"the wrong arm" or negligently leaves "a sponge in a patient's body."  *Id.* at 97-98, 288 A.2d at 387 (citations omitted).  And, the court said, *id.* at 98, 288 A.2d at 388: "'It requires no expert evidence . . . to show that failure altogether to attend [to] a patient, when common sense indicates that without attention the consequences may be serious, is not reasonable care.'" (Citation omitted).

The court observed that a nurse told Dr. Thomas that Corso had been struck by a car, had an abrasion on his forehead, and had complained of numbness in his right thigh.  *Id.* at 99, 288 A.2d at 388.  The court found that the "size, weight and force inherent in the operation of an automobile are generally understood by laymen[.]"  *Id.*  And, the court noted that a layperson generally understands "the probability of serious internal injury and fracture of bones likely to result from a collision of an automobile with a human body."  *Id.*  Therefore, it concluded that the doctor's failure to be present at the hospital, and his failure to attend to Corso, constituted facts from which a "layman c[ould], without expert assistance, reasonably conclude" that the doctor was negligent.  *Id.*

### ii.

Defendants contend that this is not the sort of medical malpractice case that can proceed to trial in the absence of an expert witness.  ECF 56-1 at 10-14.  I agree.  The core of plaintiffs' argument is that defendants erred by failing to ensure that Green received a prompt neurosurgery consultation and surgery in the face of his deteriorating medical condition, permitting him to needlessly suffer for months until the consultation and surgery occurred.  *See* ECF 59 at 1-2, 5.

But, it is not as if Green was left unattended during this period.  To the contrary, Green was seen by medical providers several times prior to his neurosurgery consultation on October 30, 2015, including on July 22, 2015; August 17, 2015; August 31, 2015; September 25, 2015;

September 28, 2015; and October 21, 2015.  *See* ECF 56-6 at 1-2, 5-6, 9-10, 12-16.  Notably, the practitioners' observations as to Green's condition reflect symptoms of varying severity.  For example, on September 28, 2015, Green's stimulator is described as protruding from his knee, but on October 21, 2015, the stimulator is described as no longer visible, with Green doing "much better."  *Id*. at 14-16.

The medical practitioners who saw Green during these visits ordered a number of different treatments, including wound care and multiple types of antibiotics.  *See id*. at 5-6, 12.  Several tests and procedures were authorized and conducted, including labs, x-rays, and a CT scan.  *See id*. at 3-4, 10, 47-53, 56-57.  And, it is undisputed that the results from these procedures did not demonstrate cause for alarm.  *See id*.; *see also* ECF 56 at 4-5; ECF 56-9 at 6; ECF 59 at 2.  On November 3, 2015, for example, Dr. Bontempo found that there was no acute infection.  ECF 56-6 at 36.  And, the defense experts have opined that Green's infection was localized but not systemic.  ECF 56-9 at 6; ECF 56-10 at 3.

There is repeated mention of practitioners planning or preparing for Green's consultation and surgery.  *See id*. at 1, 12, 15-16, 55.  When Green did see Dr. Park on October 30, 2015, Dr. Park recommended a "PICC line placed ASAP and antibiotics started."  *Id*. at 30.  This occurred a few days later, on November 4, 2015.  *Id*. at 39-40.  The course of IV antibiotics was completed on November 16, 2015, and Green received the surgery two days later.  *Id*. at 19, 40-46.  The surgery was successful (*id*. at 45), and there is no assertion or evidence in the record of any continuing injury to Green after his surgery that stemmed from any delay in receiving the surgery.[17]

In short, this is not a case in which "'the alleged negligence is so obvious that the trier of

---

[17] Many people experience delays in obtaining medical appointments, without regard to their station in life. It is not uncommon to wait lengthy periods of time when attempting to schedule a medical appointment, particularly for a new condition with a new doctor.

fact could easily recognize that such actions would violate the applicable standard of care.'" *Jones*, 425 Md. at 26, 38 A.3d at 348 (citation omitted).  Indeed, this case is far from one where an on-call doctor fails to proceed to the hospital to treat the victim of a car accident, or the surgeon who amputates the wrong limb.  *See Thomas*, 265 Md. at 97-99, 288 A.2d at 387-88.  Jurors would be required to evaluate a sustained course of care and treatment rendered to a prisoner over a period of several months, including questions as to whether particular medications and procedures were appropriate at particular times, and the specific timing of Green's neurosurgical consultation and surgery.

The conclusion that an expert from plaintiffs is required in these circumstances is buttressed by the fact that defendants have produced two experts on their behalf, who have opined that the standard of care was not breached.  In particular, Dr. Wilcox has found that Green's treatment, including his consultation and surgery, was timely; that Green's overall care was "medically reasonable" and "conformed to the standard of care;" and that no act or omission by defendants proximately caused any injuries claimed by Green.  ECF 56-9 at 6-7.  Dr. Simon has concluded that "Green received appropriate evaluation and medication management for his chronic infection."  ECF 56-10 at 3.

It is not clear that plaintiffs actually argue that they may proceed to trial on their negligence claims without an expert.  Plaintiffs' single page of briefing regarding negligence is premised on the Wilson Report.  *See* ECF 59 at 5.  Nevertheless, in their briefing on their deliberate indifference claim, plaintiffs argue that there is a triable question of fact even without an expert as to whether the "months-long delay in implementing the treatment plan [to receive a neurosurgical evaluation] violated the standard of care."  *Id*. at 7.  To the extent that plaintiffs seek to apply this argument to their negligence claims, I am not persuaded.  Green received consistent care and treatment over a

months-long period, and evaluating this care and treatment, including whether the consultation should have occurred earlier, involves complicated medical questions beyond the ken of a lay juror.

In the same argument, plaintiffs note that Dr. Wilcox stated that the treatment plan formulated by Dr. Rizvi on July 22, 2015, which included a request for an urgent neurosurgery evaluation, conformed to the standard of care. *See* ECF 56-9 at 6-7. Thus, they maintain that the delay in Green receiving this evaluation would necessarily violate the standard of care, according to defendants' own expert. But, the Wilcox Report is explicit that Green's overall care conformed to the standard of care, including with respect to the timeliness of the consultation. *Id.* at 7. This argument is not enough to obviate the need for an expert witness.

In sum, plaintiffs propose to ask a jury to evaluate the conduct of multiple physicians across several months of medical visits, procedures, and treatments, culminating in a successful surgery. In these circumstances, they are required to produce an admissible expert witness in order to proceed with their negligence case. They have not done so. Therefore, I will grant summary judgment in favor of the individual defendants as to Counts I, II, and III.

### 2. Respondeat Superior Claim (Count IV)

In Maryland, "[l]itigants may invoke the doctrine of respondeat superior as a means of holding an employer, corporate or otherwise, vicariously liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time." *S. Mgmt. Corp. v. Taha*, 378 Md. 461, 480-81, 836 A.2d 627, 638 (2003).

Count IV, the respondeat superior claim against Wexford, is premised on the "negligence, carelessness, and breaches of the medical standards of care" by the individual defendants. ECF

28, ¶ 86.  The parties do not approach Count IV separately from the individual negligence claims. Rather, they appear to concur that if the individual negligence claims fail, so must Count IV.  I agree that if plaintiffs cannot maintain their individual negligence claims, their respondeat superior claim must meet the same fate.  Accordingly, I will grant summary judgment to Wexford as to Count IV.

### 3.   Deliberate Indifference Claim (Count VI)

#### i.

Count VI is brought pursuant to 42 U.S.C. § 1983, and alleges "deliberate indifference to Mr. Green's serious and known medical needs."  ECF 28, ¶ 90.  Section 1983 of Title 42 of the United States Code provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see, e.g., Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48

48

(1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).   The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical."   *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)).

Section 1983 also requires a showing of personal fault based upon a defendant's own conduct.  *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).   Thus, there is no respondeat superior liability under § 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Scinto*, 841 F.3d at 225.  It protects the rights of postconviction detainees.  *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671 n.40 (1977)).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *DeLonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).  The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates."  *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *see Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

For a plaintiff to prevail in an Eighth Amendment suit as to the denial of adequate medical care, the defendant's actions or inaction must amount to deliberate indifference to a serious medical need.  *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  The Fourth Circuit has characterized the applicable standard as an "exacting" one.  *Lightsey*, 775 F.3d at 178.

In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance.  *See Farmer*, 511 U.S. at 834; *Hixson*, 1 F.4th at 302; *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017).  "The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally *denying* or *delaying* medical care, or intentionally *interfering* with prescribed medical care."  *Formica v. Aylor*, 739 Fed. App'x 745, 754 (4th Cir. 2017) (emphases in *Formica*).

The deliberate indifference standard is analyzed under a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety."  *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38).

50

Deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need and that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer*, 511 U.S. at 837; *see also DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228.

In a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014). Moreover, "[w]here a deliberate indifference claim is predicated on a delay in medical care, [the Fourth Circuit has] ruled that there is no Eighth Amendment violation unless 'the delay *results* in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica*, 739 Fed. App'x at 755 (internal citations omitted) (emphasis in *Formica*).

"There is no requirement . . . that a plaintiff alleging deliberate indifference present expert testimony to support his allegations of serious injury or substantial risk of serious injury." *Scinto*, 841 F.3d at 230. Instead, "when the seriousness of an injury or illness and the risk of leaving that injury or illness untreated would be apparent to a layperson, expert testimony is not necessary to establish a deliberate indifference claim." *Id.* In *Scinto*, the Fourth Circuit applied this principle to hold that a claim for denial of insulin to diabetic inmates by prison officials did not require expert testimony to "demonstrate an objectively serious deprivation," because "a jury is capable of understanding, unaided, the risks of failing to provide insulin to a diabetic and of a trained

doctor's denial of a diabetic's known need for insulin." *Id.*

Proof of an objectively serious medical condition, however, does not end the inquiry.  As the Court explained in *Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017), "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry."

In the context of a claim concerning medical care, the subjective component of the standard requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind."  *Wilson*, 501 U.S. at 298; *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225.  Reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."  *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see Young*, 238 F.3d at 575-76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."); *see Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).

As the *King* Court reiterated, 825 F. 3d at 219: "The requisite state of mind is thus 'one of deliberate indifference to inmate health or safety.'" (citation omitted).  Put another way, "it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the

official's action or inaction." *Lightsey*, 775 F.3d at 178 (emphasis in *Lightsey*).

"To find the prison officials liable, the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (internal citation omitted). Deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.*; *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it ... [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . .").

Moreover, mere negligence or malpractice does not rise to the level of a constitutional violation. In *Estelle*, 429 U.S. at 106, the Supreme Court said: "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *See also Hixson*, 1 F.4th at 303; *Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986) (citing *Estelle*, 429 U.S. at 106). Further, "[t]he right to treatment is . . . limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added).

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A

plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).  In other words, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk." *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995).

But, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard.  *See Hixson*, 1 F.4th at 302-03; *Scinto*, 841 F.3d at 225-26; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285 (4th Cir. 1977).  Indeed, "a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim." *Hixson*, 1 F.4th at 303. Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems.  *See Startz v. Cullen*, 468 F.2d 560, 561 (2d Cir. 1972); *Smith v. Mathis*, PJM-08-3302, 2012 WL 253438, at * 4 (D. Md. Jan. 26, 2012), *aff'd*, 475 Fed. App'x 860 (4th Cir. 2012).

In Scinto, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus must have known about it ...." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842 114 S.Ct. 1970). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Even if the requisite subjective knowledge is established, however, an official may still

avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

The question is whether there is a dispute of material fact as to the conduct of each individual defendant in regard to deliberate indifference to a serious medical need.  *See Iqbal*, 556 U.S. at 676; *Wilcox*, 877 F.3d at 170.  The proverbial guilt by association does not apply; the conduct of each party must be considered separately.  *Odom v. S.C. Dep't. of Corr.*, 349 F.3d 765, 771-72 (4th Cir. 2003) (considering whether the individual conduct of each defendant amounted to deliberate indifference).

In *Brown*, 240 F.3d at 390, the Fourth Circuit explained: "In determining the substantiality of the risk that [one defendant officer, among several] knew, and the reasonableness of his response to it, we must consider everything that he was told and observed."  Similarly, in *Bishop v. Hackel*, 636 F.3d 757, 768 (6th Cir. 2011), the court said: "[W]e must focus on whether each individual Deputy had the personal involvement necessary to permit a finding of subjective knowledge."  *See also Dale v. Poston*, 548 F.3d 563, 570 (7th Cir. 2008) (stating that a court must examine "what the officer knew and how he responded"); *Grieveson v. Anderson*, 538 F.3d 763, 777-78 (7th Cir. 2008) ("Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants.").

**ii.**

I conclude that plaintiffs have not succeeded in demonstrating a genuine dispute of material

fact with respect to any claim of deliberate indifference on the part of Dr. Obsu, Dr. Onabajo, or Dr. Rizvi.  For starters, defendants have produced two experts, Dr. Wilcox and Dr. Simon, who opine that the care and treatment provided to Green was appropriate, reasonable, and consistent with relevant standards of care.  As discussed, Dr. Wilcox is of the view that Green's treatment was timely; that Green's overall care was "medically reasonable" and "conformed to the standard of care;" and that no act or omission by defendants proximately caused any injuries claimed by Green.  ECF 56-9 at 6-7.  In particular, Dr. Wilcox states, *id*. at 7: "Mr. Green was seen in a timely fashion with respect to the consultation with the neurosurgeon.  The neurosurgeon recommended placement of a PICC line and preoperative antibiotics which were completed expeditiously."  Similarly, Dr. Simon opined that "Green received appropriate evaluation and medication management for his chronic infection."  ECF 56-10 at 3.

Conversely, plaintiffs have produced no admissible expert testimony.  Without such an expert, their argument in the Opposition boils down to bare assertions that the care the individual defendants provided was inadequate, and that the individual defendants were deliberately indifferent for failing to ensure that Green received a neurosurgery consultation earlier than he did. *See* ECF 59 at 6-8.[18]  To be sure, a plaintiff is not necessarily required to offer expert testimony in a deliberate indifference claim.  *See Scinto*, 841 F.3d at 230.  But, as discussed above with reference to plaintiffs' negligence claims, Green's medical issue presents complicated questions that would not easily be analyzed by a jury, "unaided" by an expert.  *Id*.  Plaintiffs have the burden of proof.  Their failure to provide admissible expert testimony to establish wrongdoing, or to refute

---

[18] At one point in their argument, plaintiffs generically assert: "Defendant Wexford also failed to ensure that Mr. Green saw a neurosurgeon despite knowing that Mr. Green required such 'urgent' care as of July 23, 2015." ECF 59 at 7. But, as noted, Wexford has been dismissed from Count VI. *See* ECF 46; ECF 47.

the opinions offered by defendants' experts, weighs heavily against them.

In any event, even without any experts, the record itself clearly dispels any claim of deliberate indifference.  Examining the individual conduct of Dr. Obsu, Dr. Onabajo, and Dr. Rizvi, as I must, *see Odom*, 349 F.3d at 771-72, confirms that summary judgment for defendants is appropriate.  In particular, plaintiffs have not created a genuine dispute of material fact as to whether any individual defendant acted with reckless disregard in the face of a serious medical condition, under the "very high standard" applicable to deliberate indifference claims.  *Grayson*, 195 F.3d at 695.

Green's sole visit with Dr. Obsu took place on August 17, 2015.  ECF 56-6 at 5-6.  Dr. Obsu noted a draining abscess on Green's left knee, and that the left knee had "swelling" and "tenderness."  *Id*. at 5.  Dr. Obsu ordered wound care and sterile dressing for the knee, and prescribed Bactrim DS, an oral antibiotic.  *Id*. at 5-6.[19]  In addition, on August 3, 2015, Dr. Obsu generated a consult request for the CT scan that Dr. Getachew had previously authorized.  *Id*. at 3.

Plaintiffs dispute that Dr. Obsu provided the most appropriate care, and maintain he should have attempted to ensure that Green promptly received his neurosurgical evaluation.  But, this is essentially a disagreement regarding the proper course of treatment of Green, which does not support a deliberate indifference claim.  *See Hixson*, 1 F.4th at 302-03; *Scinto*, 841 F.3d at 225-26; *Wright*, 766 F.2d at 849.

Green saw Dr. Onabajo twice prior to his surgery, on August 31, 2015, and November 3, 2015.  And, Dr. Onabajo also saw Green on November 20, 2015, after Green's surgery.  ECF 56-6 at 24-25.

---

[19] Dr. Wilcox specifically opined that "oral antibiotics and wound care were appropriate for the management of [Green's infection] until definitive care could be scheduled."  ECF 56-9 at 6.

On August 31, 2015, Green presented to Dr. Onabajo, complaining of sweating.  ECF 56-6 at 9-10.  Dr. Onabajo assessed that Green had sweating fever, but noted that he had "no other complaints," and no fever, chills, cough, nausea, vomiting, diarrhea, chest pain, shortness of breath, or weight changes.  ECF 56-6 at 9-10.  He recorded that Green had a "wound on the left thigh," which was "swollen with area of ulceration and minimal drainage," and was "warm / tender."  *Id*.  He ordered labs and x-rays, and indicated that a follow-up should occur if there was no improvement within four days.  *Id*. at 10.  Results from the x-rays and labs, as well as the previously ordered CT scan, were received by mid-September 2015, and there is no dispute that they did not indicate any cause for alarm.

Green also saw Dr. Onabajo on November 3, 2015, a few days after his consultation with Dr. Park.  *Id*. at 17-18, 54.  Dr. Onabajo urgently requested the PICC line for the IV antibiotics recommended by Dr. Park—which was approved by Dr. Getachew the next day—and noted the scheduling of Green's forthcoming surgery.  *Id*. at 17-18, 54.

As with Dr. Obsu, plaintiffs plainly disagree with the particular approach taken by Dr. Onabajo.  But, this does not translate to a deliberate indifference claim.  It is clear that Dr. Onabajo assessed Green's condition and ordered meaningful care in response, including labs and x-rays, which were done.

According to the medical records, when Green saw Ezenwachi on September 28, 2015, regarding his protruding device, Dr. Onabajo was "made aware."  *Id*. at 14.  He directed that Ezenwachi call Dr. Temesgen, who apparently ordered a follow up for the next day.  *Id*.  Ezenwachi's notes also mention an appointment with a neurologist on October 2, 2015.  *Id*. at 14.  As discussed, the medical records do not reflect a follow up the next day, nor an appointment on October 2, 2015.  But, there is absolutely no evidence in the record that Dr. Onabajo, nor either of

the other two individual defendants, was involved in or responsible for a potential follow up on September 29, 2015, or the appointment for October 2, 2015. And, the Opposition does not make any argument related to these appointments.

Dr. Rizvi saw Green three times. At the first visit, on July 22, 2015, Dr. Rizvi assessed that Green had no clinical signs of infection, but he requested an urgent neurosurgical evaluation. ECF 56-6 at 1-2, 27, 55.[20] That request is hardly consistent with deliberate indifference.

The next visit took place on September 25, 2015. *Id*. at 12-13. This visit does not reflect deliberate indifference. To the contrary, Dr. Rizvi was joined by two additional physicians, Dr. Getachew and Dr. Atnafu, who together analyzed Green's situation. *Id*. at 12. According to the medical record for the visit, Green had "[n]o fever;" his vitals were "stable;" and he had finished a round of Bactrim DS two weeks prior. *Id*. The physicians assessed the leg infection as a "chronic infection," and recommended starting Green on Zyvox, another antibiotic. *Id*. And, they discussed plans to arrange a surgery for Green to remove his stimulator. *Id*. at 12.

The final visit occurred on October 21, 2015, nine days before Green's neurosurgery consultation with Dr. Park. *Id*. at 15-16. By the time of this visit, Green's surgery was apparently already planned. Dr. Rizvi assessed Green's condition as "much better," noting the wire was no longer visible, and found that there were no major contraindications for surgery. *Id*.

As with the other two individual defendants, the undisputed facts do not begin to approach deliberate indifference. During plaintiff's three visits with Green, Dr. Rizvi assessed Green, prescribed medication, submitted requests for the consultation that plaintiffs assert was necessary,

---

[20] The Opposition states, ECF 59 at 6: "Dr. Rizvi listed the wrong hospital (Bon Secours instead of Mercy Medical Center) when he submitted his urgent surgical consultation request for approval." (Citing ECF 56-6 at 57). But, as noted, no evidence or material has been provided as to what effect, if any, this designation of Bon Secours might have had on subsequent events, and no evidence has been provided indicating that this designation did, in fact, cause any delay.

and made arrangements for the surgery that plaintiffs also assert was necessary. Plaintiffs' argument as to Dr. Rizvi's care does little more than critique the reasonableness of his particular approach, which is not adequate to support a deliberate indifference claim.

More broadly, as noted, plaintiffs contend that the individual defendants were deliberately indifferent because they failed to ensure that Green received his neurosurgical consultation before October 30, 2015, even as his condition deteriorated. ECF 59 at 7-8. As an initial matter, it is far from clear that plaintiffs have shown a genuine dispute of material fact as to whether any delay in obtaining the consultation with Dr. Park actually resulted in "'some substantial harm'" to Green, as is required for delay claims. *Formica*, 739 Fed. App'x at 755 (internal citation omitted).

Plaintiffs assert that Green suffered from a "rapidly degrading medical condition." ECF 59 at 7. To be sure, it is clear Green had an infection, and Dr. Park indicated in his consultation record that Green's left leg had been "infected for 3 months." ECF 56-6 at 30. But, according to Dr. Wilcox, between "the presentation of the problem" and the surgery, Green's condition "was localized and never became a threat to him systematically . . . from a medical perspective, his infection was localized and not serious." ECF 56-9 at 6. Likewise, Dr. Simon opined that Green developed a "localized," "chronic," and "minor" infection that did not "develop into a systemic infection." ECF 56-10 at 3. He also stated that although it was "within the clinical judgment of the neurosurgeon" to delay surgery in order for plaintiff to undergo a course of IV antibiotics, it was not necessary to do so. *Id.*

When Dr. Rizvi saw Green on October 21, 2015, for what was Green's last recorded visit before the consultation, he found Green to be improving. ECF 56-6 at 15-16. Similarly, in her visit with Green on November 3, 2015, Dr. Bontempo stated that the wound on Green's left leg did not "appear acutely infected," and that Green's lab work and vital signs were "reassuring." *Id.*

at 36.  Plaintiffs do not dispute that Green's earlier x-ray, lab, and CT scan results did not indicate any problems.

Indeed, the number of medical appointments, lab tests, x-rays, and scans speak volumes about the flawed constitutional challenge.  But, even if plaintiffs created a genuine dispute of material fact as to the objective prong, they have not done so as to the subjective prong; that is, whether defendants acted with reckless disregard by not ensuring that Green's consultation was scheduled more promptly.

Plaintiffs do not point to any specific action on the part of the individual defendants that delayed the consultation, aside perhaps from Dr. Rizvi allegedly selecting the wrong hospital, about which no further information has been provided.  *See* ECF 59 at 6.  As far as the record reflects, it was Dr. Getachew, who is not a defendant, who approved a CT scan following the consultation request.  ECF 56-6 at 56.  Instead, plaintiffs' claim seems to be that, in the course of their treatment of Green, the individual defendants should have advocated for an immediate consultation.

The record does not reflect that initially, when Green experienced a health issue, he encountered an undue delay in seeing a health care provider.  The individual defendants provided Green with consistent care throughout this period.  They repeatedly assessed Green, came to conclusions, prescribed medication, and ordered tests and procedures.  *See, e.g.*, *id*. at 1-2, 5-6, 9-10, 12-16.  And, two experts have opined that this care was reasonable, timely, and appropriate.  *See* ECF 56-9 at 6-7; ECF 56-10 at 3.  Plaintiffs offer little more than conclusory assertions that the individual defendants were deficient in not ensuring that Green had an immediate neurosurgery consultation.  At most, plaintiffs have shown a reasonable disagreement with the individual

defendants as to the proper course of treatment, or lodged an allegation that the defendants fell below the standard of care.  This is not enough to sustain a deliberate indifference claim.

As discussed, the Opposition notes that Dr. Wilcox stated that the treatment plan formulated by Dr. Rizvi on July 22, 2015, which included a request for an urgent neurosurgery evaluation, conformed to the standard of care.  *See* ECF 56-9 at 6.  Thus, they contend that the delay in Green receiving this evaluation would necessarily violate the standard of care, according to defendants' own expert.  This is inadequate, without more, to create a genuine dispute of material fact.  The same Wilcox Report is explicit that Green's overall care conformed to the standard of care, including with respect to the timeliness of the consultation.  *Id*. at 7.  And, in any case, a violation of the standard of care does not equate to deliberate indifference.  *See, e.g.*, *Estelle*, 429 U.S. at 106; *Lightsey*, 775 F.3d at 178,

At bottom, the plaintiffs assert that a course of medical care and treatment over several months, which ended in a surgery that by all accounts went well and resolved the problem, amounted to deliberate indifference—that is, treatment that was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Hixson*, 1 F.4th at 303 (internal citation omitted).  They attempt to do so without any admissible expert testimony, in the face of two defense experts who have emphatically endorsed the care provided to Green.

Perhaps there were ways Green's care might have been improved; perhaps other medical practitioners might have approached Green's situation differently.  But, "[d]eliberate indifference is a very high standard," for "the Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . ." *Grayson*, 195 F.3d at 695-96.

Clearly, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also, e.g.*, *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Hixson*, 1 F.4th at 303 (noting that even "a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim"). Accordingly, I will grant summary judgment to the individual defendants as to plaintiffs' deliberate indifference claim, contained in Count VI.[21]

### 4. Loss of Consortium Claim (Count V)

The SAC asserts a claim for loss of consortium against all defendants. ECF 28, ¶¶ 88-89. Although the SAC is not explicit, this claim appears to be related to Green not being permitted to transfer to home detention on November 25, 2015, because he was still taking oxycodone after the surgery. *See* ECF 56-6 at 26; *see also* ECF 56-1 at 16-17; ECF 59 at 7.

Maryland allows a plaintiff to recover for loss of consortium where a personal injury to one's self or one's spouse results in a "loss of society, affection, assistance, and conjugal fellowship" in the marital unit. *Oaks v. Connors*, 339 Md. 24, 37-38, 660 A.2d 423, 430 (1995). However, "'[a] loss of consortium claim is derivative of the injured spouse's claim for personal injury.'" *Owens-Illinois, Inc. v. Cook*, 386 Md. 468, 488, 872 A.2d 969, 981 (2005) (quoting *Oaks*, 339 Md. at 38, 660 A.2d at 430) (alteration in *Cook*); *see also Deems v. W. Md. Ry. Co.*, 247 Md. 95, 114, 231 A.2d 514, 525 (1967) (holding that a claim for loss of consortium arising from physical injury must be asserted simultaneously with an underlying tort action).

---

[21] As noted, Wexford has already been dismissed from this claim. *See* ECF 46; ECF 47.

Citing *Oaks*, defendants argue that if they are entitled to summary judgment on the negligence and deliberate indifference claims, they are also entitled to summary judgment on the loss of consortium claim.  ECF 56-1 at 16-17.  The Opposition contains no explicit discussion of the loss of consortium count.  In light of my conclusions concerning the other claims, the loss of consortium claim is no longer tenable.  Therefore, I will grant summary judgment to defendants as to Count V.

## IV.     Conclusion

For the reasons stated above, I shall grant the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date: July 27, 2022                              _____/s/_____
                                                           Ellen L.  Hollander
                                                           United States District Judge

64